## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ABN AMRO, INCORPORATED,         )
                                       )
               Plaintiff,        )      No. 04 C 3123
                                       )
     v.                      )      Honorable Mark R. Filip
                                       )
CAPITAL INTERNATIONAL LIMITED,  )
EIRLES FOUR LIMITED, DEUTSCHE BANK  )
AKTIENGESELLSCHAFT, SARCO     )
HOLDINGS and DHANANJAY (Dan) HAJELA,  )
                                       )
            Defendants.    )

## MEMORANDUM OF EIRLES FOUR LIMITED AND DEUTSCHE BANK AKTIENGESELLSCHAFT IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

Jerrold E. Salzman
Phillip L. Stern
Richard P. Campbell
Freeman, Freeman & Salzman, P.C.
401 North Michigan Avenue
Suite 3200
Chicago, Illinois 60611
Tel:    312-222-5100
Fax:   312-822-0870

*Attorneys for Eirles Four Limited and Deutsche Bank Aktiengesellschaft*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...................................................................................................... 1

    ABN's Purchase of the Series 42 Notes ........................................................... 3

    The Series 42 Notes ........................................................................................... 4

ARGUMENT ............................................................................................................. 7

I.    THE SERIES 42 NOTES WERE SOLD TO ABN IN A PRIVATE TRANSACTION
    WHICH DID NOT REQUIRE REGISTRATION (Count I) ................................. 7

    A.  The Sale Of The Notes Was An Exempt Private Placement ........................... 8

    B.  Eirles Was Not A "Seller" Within The Meaning Of Section 12(a)(1) ............. 9

II.   THE AMENDED COMPLAINT FAILS TO STATE A CAUSE OF ACTION
    FOR VIOLATION OF THE ANTI-FRAUD PROVISIONS OF THE FEDERAL
    SECURITIES LAWS (Count II) .......................................................................... 10

    A.  Scienter: The Amended Complaint Fails To Support A Strong Inference
    That Eirles or Deutsche Bank Intended To Defraud ABN. All Material
    Facts Were Disclosed Or Were Available To ABN ....................................... 11

    B.  Reliance: Since ABN Did Not Intend To Own The Notes It Did Not
    Review Or Rely On The Terms And Conditions Of The Notes ..................... 17

    C.  Materiality: The Alleged Sales Restriction Was Fully Disclosed And
    Was Not Material To ABN's Decision To Act As a "Riskless" Principal ..... 18

    D.  Loss Causation: Any Economic Loss ABN Suffered By Reason Of Its
    Ownership Of The Notes Was Not The Result Of An Omission By Eirles
    Or Deutsche Bank .......................................................................................... 20

III.  ABN FAILS TO STATE A CLAIM FOR VIOLATIONS OF THE ILLINOIS
    SECURITIES ACT AGAINST EIRLES AND DEUTSCHE BANK (Count IV) ......... 22

IV.  ABN FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD (Count V) ........... 25

V.   ABN FAILS TO STATE A CLAIM FOR VIOLATION OF THE ILLINOIS
     CONSUMER FRAUD ACT (Count VI) ...............................................................................26

VI.  ABN FAILS TO STATE A CLAIM FOR UNJUST UNRICHMENT AGAINST
     DEUTSCHE BANK (Count VII) ........................................................................................27

VII. ABN FAILS TO STATE CLAIMS FOR NEGLIGENT MISREPRESENTATION
     AGAINST EIRLES AND DEUTSCHE BANK (Counts VIII and IX)...............................28

VIII. A SEPARATE CAUSE OF ACTION DOES NOT EXIST FOR ALTER EGO
      LIABILITY (Count X) ......................................................................................................30

CONCLUSION..............................................................................................................................30

## TABLE OF AUTHORITIES

**Page**

### CASES

*Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969 (7th Cir. 2002) ................................1

*Basic Incorporated v. Levinson*, 485 U.S. 224 (1988).......................................................................10

*Birnberg v. Milk St. Residential Assocs. Ltd. P'ship*, 2003 WL 151929
    (N.D. Ill. Jan. 21, 2003) .................................................................................................................30

*Charles Hester Enter., Inc. v. Ill. Founders Ins. Co.*, 137 Ill. App. 3d 84,
    484 N.E. 2d 349 (5th Dist. 1985)..................................................................................................27

*Denten v. Merrill Lynch, Pierce, Fenner & Smith*, 887 F.Supp. 176 (N.D. Ill. 1995) .....................22

*DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir)., *cert. denied*,
    498 U.S. 941 (1990)......................................................................................................................11

*Doran v. Petroleum Management Corp.*, 545 F.2d 893 (5th Cir. 1977) .............................................8

*Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 161
    L.Ed.2d 577, 585 (2005) .......................................................................................................10, 20

*Endo v. Albertine*, 1995 WL 170030 (N.D. Ill. April 7, 1995)..........................................................10

*Equity Builders & Contractors, Inc. v. Russell*, 2005 WL 2664243
    (N.D. Ill. Oct. 17, 2005)..........................................................................................................28, 30

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)..........................................................................10

*Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 2005 WL 843297
    (N.D. Ill. Jan. 20, 2005) ...............................................................................................................29

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 355 Ill.App.3d 546,
    823 N.E. 2d 168 (1st Dist. 2005) ............................................................................................29,30

*Fox Assoc., Inc. v. Robert Half Int'l., Inc.*, 334 Ill. App.3d 90,
    777 N.E. 2d 603 (1st Dist. 2002) ............................................................................................28,29

*In re Caremark International, Inc. Securities Litigation*, 1996 WL 238820,
    (N.D. Ill. Apr. 30, 1996) ...............................................................................................................29

*In re Laser Arms Corp. Sec. Litigation*, 794 F.Supp. 475 (S.D.N.Y. 1989)........................................9

*Jackson v. First Federal Savings, F.A.*, 709 F.Supp. 863 (E.D. Ark. 1988) ......................................9

*Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941 (N.D. Ill. 2004) ........................................................11

*Johnson v. Mutual Savings Bank*, 1996 WL 79414 (N.D. Ill. Feb. 21, 1996) ..................................29

*Johnston v. Bumba*, 764 F.Supp. 1263 (N.D. Ill. 1991)....................................................................8

*Liebhard v. Square D Co.*, 1991 WL 206169 (N.D. Ill. Oct. 1, 1991................................................29

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2006 U.S. App.
    LEXIS 1865 (7th Cir. Jan. 25, 2006) .................................................................................10,11

*Mark v. FSC Securities Corp.*, 870 F.2d 331 (6th Cir. 1989) .............................................................8

*Mary S. Krech Trust v. Lakes Apartments*, 642 F.2d 98 (5th Cir. 1981) ...........................................8

*Meers v. Sundstrand Corp.* 434 U.S. 875 (1977) .............................................................................10

*Napier v. Bruce, et al.*, 2004 U.S. Dist. LEXIS 9772
    (N.D. Ill. May 27, 2004) .....................................................................................................12

*Nicpon v. Goehausen*, 1991 WL 5866 (N.D. Ill. Jan. 15, 1991).......................................................23

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
    Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) .........................................................................1

*Northern Trust Co. v. Peters*, 69 F.3d 123 (7th Cir. 1995)...............................................................27

*Peetoom v. Swanson*, 334 Ill. App. 3d 523, 778 N.E. 2d 291 (2d Dist. 2002) .................................30

*Pinter v. Dahl*, 486 U.S. 622 (1988) .................................................................................................9

*Premier Capital Mgmt., LLC v. Cohen*, 2003 WL 21960357
    (ND. Ill. Aug. 15, 2003)......................................................................................................12

*Prime Leasing, Inc. v. Kendig*, 332 Ill.App. 3d 300, 773 N.E.2d 84 (1st Dist. 2002).....................26

*Rankow v. First Chicago Corp.*, 870 F.2d 356 (7th Cir. 1989) ........................................................30

*Reshal Associates, Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226 (N.D. Ill. 1990)................22

*Rosenzweig v. Azurix Corp.*, 332 F. 3d 854 (5th Cir. 2003) ..............................................................9

*SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1 (D.D.C. 1998) ............................................................8

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)................................................................8

*766347 Ontario, Ltd. v. Zurich Capital Markets, Inc.*, 249 F.Supp.2d 974
(N.D. Ill. 2003)....................................................................................................22

*Soules v. General Motors Corp.*, 79 Ill.2d 282, 402 N.E. 2d 599 (1980).........................26

*Speakers of Sport, Inc. v. Proserv, Inc.*, 178 F.3d 862 (7th Cir. 2004)..........................26

*Starr v. !Hey, Inc.*, 2003 WL 21212596 (N.D. Ill. May 23, 2003) ....................................9

*Stavros v. Exelon Corporation*, 266 F. Supp. 2d 833 (N.D. Ill. 2003) .............................1

*Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508,
(S.D.N.Y. Sept. 20, 2001).......................................................................................9

*Steinberg v. Chicago Medical School*, 371 N.E. 2d 634, 69 Ill.2d 320 (1977) ...............27

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.) *cert. denied*............10

*Swenson v. Engelstad*, 626 F.2d 421 (5th Cir. 1980).........................................................8

*Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522
(7th Cir. 1985).....................................................................................................20

*Tirapelli v. Advanced Equities, Inc.*, 351 Ill.App.3d 450, 813
N.E.2d 1138 (1st Dist. 2004) .............................................................................22

*Tolan & Son, Inc. v. KLLM Architects, Inc.* 308 Ill.App. 3d 18,
719 N.E. 2d 288 (1st Dist. 1999) .......................................................................29

*Trans Helicopter Service v. Jet Support Services, Inc.*, 2004 WL
725700 (N.D. Ill. Mar. 30, 2004)........................................................................29

*Tricontinental Indus. LTD v. Anixter*, 215 F. Supp. 2d 942 (N.D. Ill. 2002) ..................13

*TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822 (7th Cir. 1998)...................27, 28

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ......................................10, 18

*United States v. Burczyk*, 556 F.2d 394 (7th Cir. 1977) .................................................27

*Van Dyke v. Coburn Enterprises, Inc.*, 873 F.2d 1094 (8th Cir. 1989) .............................8

*Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569 (7th Cir. 2004) ...................26

## STATUTES

735 ILCS 5/209 ...........................................................................................................6, 7, 8

815 ILCS 5/13A ...............................................................................................................18

815 ILCS 505/1(e) ..........................................................................................................26

815 ILCS 505/10a ..........................................................................................................26

15 U.S.C. §771(a)(1) .........................................................................................................7

15 U.S.C. § 78a ...............................................................................................................11

15 U.S.C. § 78j ...............................................................................................................11

15 U.S.C. § 78u-4(b)(1) ...................................................................................................11

15 U.S.C. § 78u-4(b)(2) ...................................................................................................11

15 U.S.C. § 78u-4(b)(3)(A) ..............................................................................................11

15 U.S.C. § 78u-4(c)(3) ...................................................................................................30

## FEDERAL RULES

Fed.R.Civ. P. 9(b) ...............................................................................................11,21,30

Fed.R.Civ. P. 12(b)(6)...........................................................................................................1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ABN AMRO, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 3123 |
| | ) | |
| CAPITAL INTERNATIONAL LIMITED, | ) | Honorable Mark R. Filip |
| EIRLES FOUR LIMITED, DEUTSCHE BANK | ) | |
| AKTIENGESELLSCHAFT, SARCO | ) | |
| HOLDINGS and DHANANJAY (Dan) HAJELA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF EIRLES FOUR LIMITED AND DEUTSCHE BANK AKTIENGESELLSCHAFT IN SUPPORT OF THEIR MOTIONS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

### INTRODUCTION

ABN AMRO, Incorporated ("ABN") filed a complaint in May 2004 against Capital International Limited ("Capital") and Eirles Four Limited ("Eirles").[1] On November 1, 2005, ABN filed an amended complaint ("Amended Complaint" or "FAC") adding additional parties, including Deutsche Bank Aktiengesellschaft ("Deutsche Bank"), and new theories. With respect to Eirles and Deutsche Bank, the Amended Complaint seeks damages for alleged violations of the Securities Act of 1933 (Count I – violation of 12(a)(1)), the Securities Exchange Act of 1934 (Count II-10(b)(5)), the Illinois Securities Law of 1953 (Count IV), the Illinois Consumer Fraud Act (Count VI), and Illinois Common law (Count V –common law fraud; Count VII- unjust enrichment; Counts VIII and IX – negligent misrepresentation; and Count X – alter ego)

---

[1] Capital and Eirles moved to dismiss for lack of personal jurisdiction. Judge Guzman granted ABN's motion to conduct jurisdictional discovery. Much of the jurisdictional discovery record, including documents and deposition testimony, is referred to and relied upon in ABN's Amended Complaint. In addition, ABN's 151-page Amended Complaint refers to many documents and substantial testimony central to ABN's claims. These materials are properly considered by the court in ruling on a Rule 12(b)(6) motion to dismiss. *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002) (documents attached to defendant's motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to its claim); *Stavros v. Exelon Corp.*, 266 F.Supp.2d 833, 841(N.D.Ill. 2003)("The court may also review any documents referred to in the complaint."); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003) (Court may consider documents submitted by defendants referenced in complaint).

allegedly arising from ABN's purchase of $115 million in Credit Linked Secured Notes ("Series 42 Notes" or "Notes") on July 15, 2003.[2] As discussed below, the sale involved a private placement which did not require registration. Moreover, ABN has not and cannot meet the pleading requirements for securities fraud, consumer fraud or common law fraud or misrepresentation.

ABN's Amended Complaint is principally based on the absurd contention that Eirles and Deutsche Bank committed a fraud because a term sheet, which states on its face that it is incomplete and not to be relied upon, and which was provided to ABN by its customer, Hopewell Capital Group Inc. ("Hopewell"), did not include all of the relevant deal terms. ABN does not claim that Hopewell was an agent of Eirles or Deutsche Bank. ABN, which decided to forgo due diligence before agreeing to acquire the Notes on behalf of its customer, nevertheless asserts fraud based on an alleged omission in that term sheet.

ABN alleges that it agreed, as an accommodation to its customer Hopewell, to guarantee Hopewell's performance of an agreement to purchase $115 million of Series 42 Notes from Capital. Capital had acquired the Notes from Deutsche Bank, which had purchased them from the issuer Eirles. ABN became the purchaser of the Notes when Hopewell defaulted. However, ABN alleges in a state court case filed against Hopewell that Hopewell, engaged in some greater fraudulent scheme unrelated to Eirles or Deutsche Bank, defrauded ABN. (*See generally* App. Ex. A, ABN state court complaint for fraud against Hopewell and others) ("State Complaint").[3] ABN claims that it would not have guaranteed Hopewell's purchase if it had known of certain restrictions on resale of the Notes to U.S. Persons. In this case, as opposed to the State Complaint, ABN asserts that its lack of information was the result of a fraud perpetrated by Eirles and Deutsche Bank.

ABN does not claim that Deutsche Bank or Eirles made any affirmative misrepresentation. Indeed, ABN does not allege that either Eirles or Deutsche Bank ever made any representations to ABN, provided any information to ABN, or had any contact whatsoever

---

[2] ABN purchased $115 million of Series 42 Notes, $10 million of which were sold by its customer Hopewell Capital Group Inc. to a Canadian purchaser. Thus, ABN remained the owner of $105 million in Notes.

[3] Eirles and Deutsche Bank submit herewith an appendix of relevant documents ("App. Ex. ___"). The appendix contains documents referenced both in this memorandum and in the memorandum of Eirles in support of its motion to dismiss for lack of personal jurisdiction.

with ABN. Instead, ABN purports to have relied upon and been misled by an omission in a term sheet (App. Ex. B) which was prepared by Deutsche Bank but was supplied to ABN by its customer, Hopewell. (FAC par. 146) That term sheet expressly referenced the final pricing supplement and Note documentation which were available to ABN and which described the geographic sales restrictions in detail. In addition, information respecting the restrictions on sales to U.S. Persons was included in the definitive description of the Notes and was provided to ABN's customer, Hopewell. At ABN's request, Hopewell turned over some of those documents to ABN on or shortly before the date the transaction closed. Consequently, if ABN was not provided with all relevant documentation, it was not the result of any act or failure to act on the part of Eirles, Deutsche Bank or their alleged agents.

**ABN's Purchase of the Series 42 Notes**

The Notes were issued by Eirles, a limited liability company incorporated and located in Ireland. (FAC par. 28) ABN alleges that the Notes were purchased from Eirles by Deutsche Bank for distribution to an end-customer whose identity was not disclosed to either Eirles or Deutsche Bank. (FAC pars. 34, 114) In order to protect the identity of the end-customer, Capital allegedly agreed with Hopewell to act as a "pass-through" conduit to buy the Notes from Deutsche Bank and then sell them to Hopewell. Hopewell in turn was to sell the Notes to Sterling Capital Management Group ("Sterling"), an "insolvent and/or severely undercapitalized" broker dealer (App. Ex. A, State Complaint par. 24), which would then sell the Notes to its customer. (FAC pars. 101, 104, 114)

Hopewell, "a small, start-up [United States] broker-dealer with little capital or experience" (FAC par. 136) brought the Series 42 Note transaction to ABN's attention. Hopewell initially asked ABN, and ABN agreed, to act as its clearing agent for the purchase of the Series 42 Notes. (FAC pars. 2, 3, 136, 145) Sometime after agreeing to act as a conduit for Hopewell's purchase of the Notes, Capital "insisted that ABN AMRO act as a principal for the purpose of guaranteeing settlement of the trade because neither Capital nor Hopewell had the ability to finance the payment for the transaction." (FAC par. 3) ABN "agreed to act as riskless principal[4] as an accommodation to its customer Hopewell." (FAC par. 4) In other words, ABN

---

[4] ABN repeatedly characterizes its role as "riskless principal." In fact, there was no such role in this transaction. When ABN agreed to act as principal, it assumed the risks attendant upon that role. While ABN clearly contemplated and hoped that it would not be required to continue as principal by holding the Notes, in fact the legal consequence of its agreement to purchase the Notes as principal imposed that risk – a risk which became a reality.

agreed to purchase the Notes from Capital and then immediately sell the Notes to Hopewell, which in turn would sell the Notes to Sterling, which would then sell the Notes to its customer. (FAC par. 5) By agreeing to act as principal, ABN knowingly accepted the risk that its customer Hopewell, the small, start-up broker-dealer with little capital or experience, would not be able to fund the purchase of the $115 million of Series 42 Notes in which case ABN would own the Notes.

ABN became the owner of the Notes as a result of an alleged fraud perpetrated by its customer Hopewell and ABN's decision to proceed with the transaction after Hopewell's customer had announced its inability to pay. (*See generally* App. Ex. A, State Complaint). Prior to the closing of the purchase of the Series 42 Notes and before ABN paid Capital for the Notes, ABN learned that Hopewell and Hopewell's customer Sterling were going to renege on the transaction. (FAC pars. 5, 196; State Complaint par. 40) Nevertheless, ABN agreed to close and make payment for the Notes in reliance on Hopewell's purported representation that it had other purchasers for the Notes. (State Complaint pars. 40-41) ABN alleges that it was not able to promptly resell the Notes because its customer Hopewell "reject[ed] bona fide purchasers of, and purchase offers for, the Series 42 Notes because it would have caused HOPEWELL to suffer a loss on the transaction." (State Complaint pars. 41, 45) Therefore, by ABN's own admission, any loss suffered by ABN by reason of its acquisition of the Notes flowed directly from its interaction with Hopewell. (*See generally* App. Ex. A, State Complaint)

**The Series 42 Notes**

The Series 42 Notes represented approximately one percent of a € 10 billion Secured Note Program sponsored by Eirles ("Secured Notes") consisting of 84 series of notes. Each series of Secured Notes was a distinct offering with distinct segregated collateral. ABN admits that "there is a large market offshore for bearer bonds [and that] Eirles designated the Series 42 Notes as bearer bonds in order to take advantage of this large [offshore] market." (FAC par. 221) The efficiency of this "large offshore market" is evidenced by the fact that during a three-year period, 33 series of Secured Notes, with a value of approximately $2.2 billion, were successfully sold in the offshore market **before** the Series 42 Notes were sold, and 38 series of Secured Notes with a value of approximately $2.5 billion were successfully sold in the offshore market **after** the Series 42 Notes were sold. (FAC par. 9 and Ex. 3 to FAC) "Significantly, every series of notes issued both before and after the Series 42 Notes contained an identical

absolute restriction" on sales to U.S. Persons. (*Id*. at par. 243) (emphasis in original). Other than the Series 42 Notes, with respect to which both Eirles and Deutsche Bank imposed the "identical" contractual restrictions on their purchaser prohibiting distribution to U.S. Persons, none of the other Secured Notes were sold into the United States. (FAC pars. 9, 34-36, 44-45).

Eirles and Deutsche Bank always intended that the full $115 million of the Series 42 Notes be distributed outside the United States. ABN admits that "[b]ecause bearer bonds are not attractive to or suitable for U.S. investors, Eirles decided to limit the sale of the Series 42 Notes to non-U.S. Persons." (*Id*. par. 221) According to the Amended Complaint, all of "Deutsche Bank's required documentation for the Series 42 Note transactions [was transmitted] to all the actual and potential purchasers in the distribution chain." (*Id*. par. 87(e)) Among the documents Deutsche Bank required all parties to execute was a purchase agreement which set forth "Deutsche Bank's required procedures for the transaction." (*Id*. par. 87(d)) Thus not only did the purchase agreement between Eirles and Deutsche Bank restrict U.S. sales, but also each of the purchase agreements between Deutsche Bank and Capital, Capital and Hopewell, and Hopewell and Sterling, the end purchaser's broker, a copy of which ABN saw before the closing, included the following prohibition and warranty:

> [Purchaser] "represent, warrant, undertake and/or agree (d)(ii) you will not Distribute the Notes to any Third Party Purchaser (1) who is a 'U.S. Person' . . . or (2) who is purchasing the Notes for the account of or for the benefit of a U.S. Person." (App. Ex. C)

The nature of other limitations on sale to U.S. Persons was prominently disclosed in the offering documents, including the Programme Memorandum applicable to all the Notes, and in the Structured Investments Terms Module governing the terms of the Notes. (App. Ex. D at pp.78-82; App. Ex. F at pp. 12-13)

> ABN admits that:

> Eirles and Deutsche Bank recognized that there are stringent U.S. regulatory requirements imposed on foreign issuers selling securities into the United States and that there are severely negative U.S. tax consequences associated with the sale of bearer notes into the United States. Therefore, in order to maximize their profit and minimize their regulatory and tax burden, Eirles and Deutsche Bank took steps to ensure that the terms of the Series 42 Notes - similar to the terms of all of the Eirles Notes - bore the following absolute restriction against U.S. distribution:

> The Issuer has not been and will not be registered under the United States Investment Company Act of 1940, as amended (the "Investment Company Act") and the Notes have not been and will not be registered under the United States Securities Act of 1933, as amended (the "Securities Act."). Consequently, the Notes may not be offered, sold,

resold, delivered or transferred within the United States or to, or for the account or benefit of, U.S. Persons (as such term is defined in Regulation S under the Securities Act). (FAC par. 9, quoting from the Programme Memorandum)

The Programme Memorandum made clear that none of the Secured Notes were going to be registered under United States federal securities laws and as such could be sold in the United States only if there was an exemption from registration, and then only "as and to the extent specifically set forth in a Supplemental Programme Memorandum with respect to a particular Series of Notes...." (FAC Ex. 2) In other words, a prospective purchaser had to consult the relevant Series 42 Supplemental Programme Memorandum or make an inquiry to determine whether a given series of notes could be sold in the United States. It is undisputed that the relevant Supplemental Programme Memorandum did not permit sale of the Notes in the United States.

Like the Programme Memorandum, the trust agreement governing the terms of the Notes also specified that the Notes could not be sold in the United States unless permitted by the relevant Supplemental Programme Memorandum. "The Notes may not be offered or sold within the United States or to, or for the account or benefit of, U.S. Persons except and to the extent permitted by the applicable Supplemental Programme Memorandum." (App. Ex. F, DBL/DBAG Structured Investment Terms Modules 9.1.1.2 at p. 12) As noted above, the Supplemental Programme Memorandum for the Series 42 Notes did not provide any exemption that would alter the terms of the prohibitions in the trust documents. (FAC Ex. 11)

Finally, the Hopewell-Sterling purchase agreement, a copy of which ABN saw before the closing, not only emphasized that the Notes could not be sold to a U.S. Person but required a purchaser of the Notes to "represent, warrant, undertake and/or agree ... (d)(ii) you will not Distribute the Notes to any Third Party Purchaser (1) who is a 'U.S. Person' ... or (2) who is purchasing the Notes for the account of or for the benefit of a U.S. Persons." (App. Ex. C)[5]

The Programme Memorandum and the trust agreements were available to ABN for the asking. (App. Ex. D, Programme Memorandum at p. 85) ABN could have refused to close unless or until it had an opportunity to review or inquire as to the contents of the Supplemental Programme Memorandum for the Series 42 Notes. The fact that a sophisticated bank and

---

[5] App. Ex. C reveals that prior to the closing, after ABN learned from Hopewell that Hopewell and Sterling would not close, ABN asked Hopewell for a copy of the Hopewell-Sterling purchase agreement. That agreement was faxed to ABN on July 15, 2003, prior to settlement of the transaction by ABN on July 16, 2003.

investor such as ABN chose to ignore available information demonstrates that the information was not material to its decision to act as a principal, a decision it apparently thought was without risk, on behalf of its customer.

In addition to the contractual limitation, there was another reason the Notes were not suitable to be sold in the United States, a reason ABN does not allege was withheld from it prior to agreeing to the transaction. (FAC pars. 219-220) All of the Secured Notes, including the Series 42 Notes, were bearer notes. (FAC par. 9) The tax consequences of owning bearer notes caused them to be unsuitable investments for U.S. citizens except under limited circumstances not relevant here. This limitation was prominently disclosed in the Programme Memorandum. "Bearer Notes ... are subject to U.S. tax law requirements and may not be offered, sold or delivered within the United States or its possessions or to a United States Person, except in certain transactions permitted by U.S. tax regulations." (App. Ex. D, Programme Memorandum at p. 78) This information was readily available from documents publicly available to ABN prior to settlement of the Series 42 Note offering. (App. Ex. D, Programme Memorandum at p. 85) A similar restriction appeared in the trust documents which were also available. (App. Ex. F, DBL/DBAG Structured Investment Terms Modules 9.1.1.2 at p. 12) ABN ignored these warnings because it never believed that it would hold the Notes, intending simply to pass title to Hopewell, and hence the restrictions on sale were immaterial to its decision to act as a principal.

## ARGUMENT

## I. THE SERIES 42 NOTES WERE SOLD TO ABN IN A PRIVATE TRANSACTION WHICH DID NOT REQUIRE REGISTRATION (Count I)

ABN's Count I, asserted against Eirles but not Deutsche Bank, alleges that the Series 42 Notes were not registered with the United States Securities and Exchange Commission and that their sale to ABN violated the registration provisions of the federal securities laws. (15 U.S.C. §77l(a)(1)) While Eirles did not intend that the Notes be sold to any U.S. Person and took every precaution to assure they would not be, it does not follow that even if such a sale occurred, the securities laws were violated. The transaction by which ABN acquired the Notes was a private placement within the meaning of Section 4(2) of the Securities Act and thus did not require the securities to be registered. Moreover, since ABN did not purchase the Notes from Eirles, Eirles is not considered a seller within the meaning of Section 12(a)(1) of the Securities Act.

### A.    The Sale Of The Notes Was An Exempt Private Placement

Section 4(2) of the Securities Act exempts from registration transactions by issuers which do not involve a public offering of securities. The focus of the private-offering inquiry is on "the need of the offerees for the protections afforded by registration." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 127 (1953). The Supreme Court explained that "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" *Id.* at 125 (citation omitted). ABN's sophistication is beyond dispute. It is part of one of the largest banking institutions in the world with over 3,400 branches in more than 60 countries. ABN is registered with the Securities Exchange Commission ("SEC") as a broker-dealer and is a member of the National Association of Securities Dealers. (FAC par. 13) ABN is a sophisticated investor which can clearly "fend" for itself.

In addition to the sophistication of the offerees, courts applying *Ralston Purina* focus on a number of factors in determining whether a transaction is an exempt private offering: the number of offerees, their relationship to the issuer and to each other, the number of units offered and the size of the offering, and the manner of the offering (including whether public advertising or widespread promotion was used). *See Mark v. FSC Securities Corp.*, 870 F.2d 331, 333 (6th Cir. 1989); *Swenson v. Engelstad*, 626 F.2d 421, 425 (5th Cir. 1980); *SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 11 (D.D.C. 1998); *Johnston v. Bumba*, 764 F.Supp. 1263, 1272-1273 (N.D. Ill. 1991).

The Series 42 Note offering was not advertised, promoted or available to the public at large, or offered or sold to unsophisticated investors. In fact, ABN purchased the entire Series 42 Note offering. Prior to its purchase, ABN had access to or the ability to request all information relevant to the offering. (*See* discussion at pp. 16-18 of this Memorandum) *See Van Dyke v. Coburn Enterprises, Inc.*, 873 F.2d 1094, 1098 (8th Cir. 1989) ("If the offerees have a relationship with the offeror--such as employment, family or economic bargaining power--that enables the offerees to obtain all necessary information, the offering should also be exempt."); *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 903 (5th Cir. 1977) ("access to such information" includes companies with "economic bargaining power that enables the offeree effectively to obtain" information); *see also Mary S. Krech Trust v. Lakes Apartments*, 642 F.2d 98, 102 n.7 (5th Cir.1981), quoting SEC Rule 146 ("Access [to the necessary investment information] can only exist by reason of the offeree's position with respect to the issuer. Position

means an employment or family relationship or economic bargaining power that enables the offeree to obtain information from the issuer in order to evaluate the merits and risks of the prospective investment."). ABN's sophistication and bargaining power cause its purchase of the Series 42 Notes to fall squarely within the Section 4(2) exemption from registration.

**B.     Eirles Was Not A "Seller" Within The Meaning Of Section 12(a)(1)**

Beyond the fact that the sale of the Notes was a private placement for which registration was not required, Eirles was not a "seller" of the Notes within the meaning of Section 12(a)(1). A plaintiff may recover under Section 12(a)(1) only if the defendant (1) was a direct seller of the securities to the plaintiff or (2) actively solicited the sale of the securities for his own financial gain or that of the securities' owner. *See Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001), citing *Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988); *see also Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003), citing *Pinter*, 486 U.S. at 650 (Section 12(a)(1) imposes liability on those who pass title or actively solicit the plaintiff to purchase the securities at issue). Therefore, the imposition of liability requires proof of "a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 642; *see also In re Laser Arms Corp. Sec. Litigation*, 794 F.Supp. 475, 481 (S.D.N.Y. 1989) (noting the "built-in privity" requirement of Section 12(a)(1)); *Jackson v. First Federal Savings, F.A.*, 709 F.Supp. 863, 883 (E.D. Ark. 1988) (holding that, to survive a motion to dismiss, a plaintiff must plead privity between defendants and plaintiff). Liability can be imposed only on "the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers" and, thus, "a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644, n.21. The focus of the inquiry must be on "the defendant's relationship with the plaintiff-purchaser" rather than "the defendant's degree of involvement in the securities transaction and its surrounding circumstances." *Pinter*, 486 U.S. at 651.

ABN admits that it purchased the Notes from Capital, not Eirles.  (FAC par. 195) Moreover, ABN does not allege that it ever had any contact with Eirles, let alone in connection with ABN's purchase of the Notes. "To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003). Nor is there an allegation that Eirles knew about or authorized the sale of the Notes to ABN or any U.S. Persons. In fact, ABN admits that Eirles expressly prohibited the sale of the Notes into the United States. Thus, any sale in the United States was contrary to Eirles' explicit

instructions and unauthorized. Nevertheless, ABN attempts to impute seller liability to Eirles by alleging, on information and belief, that Eirles participated in the preparation of some offering documents. (FAC par. 230) This allegation, however, is insufficient to make Eirles a seller of the Notes to ABN. *Endo v. Albertine*, 1995 WL 170030, at *3 (N.D. Ill. April 7, 1995). Under these circumstances, Eirles cannot be deemed to have violated Section 12(a)(1).

## II. THE AMENDED COMPLAINT FAILS TO STATE A CAUSE OF ACTION FOR VIOLATION OF THE ANTI-FRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS (Count II)

Count II of the Amended Complaint alleges a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. In order to sustain a cause of action for a violation of Rule 10b-5, the Amended Complaint must allege four essential elements. First, scienter – "intentional or willful conduct designed to deceive or defraud investors." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). In the Seventh Circuit, reckless conduct satisfies the scienter requirement. Recklessness is defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2006 U.S. App. LEXIS 1865, at **29-30 (7th Cir. Jan. 25, 2006) quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied, Meers v. Sundstrand Corp.*, 434 U.S. 875 (1977); Second, reliance -- also referred to as transaction causation – that plaintiff would not have entered into the transaction but for the omission. *Basic Incorporated v. Levinson*, 485 U.S. 224, 248-49 (1988); Third, materiality – that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); And fourth, loss causation – that the omission caused the economic loss for which recovery is sought. *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S Ct. 1627, 1631, 161 L.Ed.2d 577, 585 (2005).

A.    **Scienter: The Amended Complaint Fails To Support A Strong Inference That Eirles or Deutsche Bank Intended To Defraud ABN. All Material Facts Were Disclosed Or Were Available To ABN**

Allegations of securities fraud must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the even stricter requirements of the Private Securities Litigation Reform Act ("PSLRA"). Fed. R. Civ. P. 9(b); 15 U.S.C. §§ 78a, 78j, 78u; *Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941, 951 (N.D. Ill. 2004). "Unlike a run-of-the-mill complaint, which will survive a motion to dismiss for failure to state a claim so long as it is 'possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief,' [citation omitted], the PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading- -one that exceeds even the particularity requirement of Federal Rules of Civil Procedure 9(b)." [citation omitted] *Makor*, 2006 U.S. App. LEXIS 1865 at * 10. For "each act or omission" alleged to violate Section 10(b), PSLRA requires ABN to "state with particularity facts giving rise to a strong inference that [Eirles and Deutsche Bank] acted with the required state of mind" – here, scienter. 15 U.S.C. § 78u-4(b)(2). *See also, Makor, Id.* at * 11. In other words, in order to avoid dismissal the complaint must marshal "sufficient facts to convince a court at the outset that the defendants likely intended 'to deceive, manipulate, or defraud.'" *Id.*

ABN cannot simply point to alleged omitted statements as evidence of scienter – it must allege facts to support the claim that such statements were omitted with impermissible intent. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941 (1990). ABN must provide a factual basis for its scienter allegation. *Makor*, 2006 U.S. App. LEXIS 1865 at * 27-28. This is an "arduous, hurdle" for ABN to overcome. *Id* at *27. Moreover, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). If a complaint lacks sufficient well pleaded facts to convince a reasonable person that the defendant knew that a material fact was omitted the complaint fails as a matter of law and shall be dismissed. 15 U.S.C. § 78u-4(b)(3)(A). See also *Makor, Id.* at * 35. The Amended Complaint strains but utterly fails to meet the stringent requirements of the PSLRA for pleading scienter.

The Amended Complaint's attempt to meet its burden of pleading facts sufficient to give rise to a strong inference of scienter is limited to the conclusory allegations that Eirles and Deutsche Bank "intentionally or recklessly failed to disclose that the Series 42 Notes could not be offered, sold, resold, delivered or transferred within the United States or to, or for the account or benefit of U.S. Persons" and failed to disclose this information in the Indicative Note Term Sheet (*See* p. 16, *infra*), other term sheets received by ABN (App Ex. G) and in a notice posted on the Bloomberg service ("Bloomberg Notice"). (FAC Ex. 10)(FAC par. 236)[6]  These allegations are insufficient as a matter of law "because they are merely conclusions." *Napier v. Bruce, et al.*, 2004 U.S. Dist. LEXIS 9772 at *20 (N.D. Ill. May 27, 2004) citing with approval *Premier Capital Mgmt., LLC v. Cohen*, No. 02-5368, 2003 WL 21960357, at *5 (N.D. Ill. Aug. 15, 2003) (Gottschall, J.)("Conclusory allegations that defendants acted with knowledge that the representations were false and misleading do not satisfy the PSLRA's pleading requirements.").

ABN attempts to sidestep this pleading deficiency by asserting that Eirles and Deutsche Bank "had motive and opportunity to make these false and misleading statements." (FAC par. 251)  ABN's motive and opportunity allegation is nothing more than the "type of boilerplate motive allegation that courts have routinely held inadequate under the heightened pleading standards for federal securities fraud claims under the PSLRA." *Napier,* 2004 U.S. Dist. LEXIS 9772 at *21. Specifically, ABN alleges that

> Eirles' only source of income is from the Eirles Notes. It thus was incentivized to use any means possible, including fraudulent ones, to sell the Series 42 Notes. Upon information and belief, Deutsche Bank made millions in profits in connection with the Series 42 Notes. It too thus was incentivized to use any means possible, including fraudulent ones, to sell the Series 42 Notes. Eirles and Deutsche Bank also had motive to make these false and misleading statements because, as explained more fully above, both entities needed to preserve the misleading appearance of a strictly off-shore offering for regulatory and tax purposes. (FAC par. 251)

General business goals such as maximizing the marketability of securities, furthering a corporation's acquisition strategy, increasing one's compensation, or keeping stock prices high are insufficient to allege the degree of motive necessary to constitute scienter. *Napier,* 2004 U.S.

---

[6] ABN's contention that it relied on the Bloomberg Notice is simply false. The Bloomberg Notice was not published until June 26, 2003, three weeks after ABN had agreed in writing on June 6, 2003 (FAC Ex. 4) to act as principal. See App. Ex. H, at SH000490. Indeed, it was ABN who insisted the notice be published. *Id.*

Dist. LEXIS 9772 at *21 (citations omitted); *Tricontinental Indus. LTD v. Anixter*, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2002) (citations omitted).

Moreover, the Amended Complaint itself negates any possible inference, let alone a strong inference, that Eirles or Deutsche Bank intended to defraud anyone or that they had any motive to defraud. ABN admits that Eirles and Deutsche Bank would "maximize their profit and minimize their regulatory and tax burden" if the Notes were sold **offshore**. (FAC par. 9) In that regard, the Amended Complaint fails to offer any explanation as to why Eirles and Deutsche Bank would resort to an elaborate scheme to sell the Series 42 Notes in the United States when they successfully sold in the offshore market every series both before ($2.1 billion in notes) and after ($2.5 billion in notes) the Series 42 Notes were offered and sold. Furthermore, the notion that the offshore market could not absorb the $115 **million** in Series 42 Notes when it easily absorbed over $4.6 **billion** of the other series of Eirles Secured Notes is ludicrous. Similarly, the Amended Complaint does not deny that Eirles and Deutsche Bank published information respecting the distribution and sales restrictions of the Series 42 Notes. The Amended Complaint offers no explanation why Eirles and Deutsche Bank would take such great care to disclose unambiguously in the Programme Memorandum, the Supplemental Programme Memorandum, the trust agreement and sales documents that the Notes could not be sold in the United States if they actually intended to mislead a purchaser.

The conduct of the parties, other than Eirles and Deutsche Bank as depicted in the Amended Complaint, also demonstrates that Eirles and Deutsche Bank did not intend that the Notes be sold in the United States. ABN admits that there was an active campaign to conceal from Eirles and Deutsche Bank that a U.S. Person was going to acquire the Notes from Capital. According to the Amended Complaint,

> [i]n an effort to prevent Deutsche Bank's legal and compliance personnel from becoming aware that the Series 42 Notes were being distributed to U.S. Persons, Sarco repeatedly instructed Capital to conceal the identity of the U.S. purchasers (*i.e.,* at the very least, ABN AMRO, Hopewell, Sterling) from Deutsche Bank. The following excerpts of telephone conversations between Sarco's Dan Hajela and Capital's officers, Anthony Long and Robert Floate, demonstrate the lengths to which Sarco went in pursuit of its attempted concealment:
>
> **Partial Conversation Between Dan Hajela and Robert Floate**
> **May 20, 2003 12:46 p.m.**

Hajela:    * * * one thing that we want to preserve is, is that each portion knows what it is doing, i.e., **as far as Deutsche is concerned they should only know that they are dealing with, uh, CIL [Capital] and Pershing.**

Floate:    um huh.

Hajela:    And that's it.  Uh, **they should not really know anything beyond that.**

**Partial Conversation Between Dan Hajela and Anthony Long
May 20, 2003 4:02 p.m.**

Hajela:    Okay, and um, the only last item for both of you which I already reinforced with Robert this morning is, is that with respect to Deutsche in particular, um, **one of the main reasons why we are using you, besides their um, their um, their requirement that, you know, that at least they deal with an off-shore dealer,** is, is basically, you know, as, as part of standard practice, uh, we would want to maintain client confidentiality.  So, um, obviously you're doing all the due diligence on the client, but **as far as Deutsche is concerned their client is Pershing and CIL [Capital] and that's where the matter ends.**

Long:    Yep, yep.

**Partial Conversation Between Dan Hajela and Anthony Long
June 19, 2003 6:03 p.m.**

Hajela:    And -- and -- and that being, **of course, I don't want to tell him about ABN-AMRO.**

Floate:    **No, no, no. Neither do I.** (emphasis in original)  (FAC par. 114)

Capital agreed to conceal from Deutsche Bank the identity of the U.S. purchasers, as reflected in these conversations between Sarco's Dan Hajela and Capital's Anthony Long:

**Partial Conversation Between Dan Hajela and Anthony Long
June 9, 2003 5:58 p.m.**

Hajela:    Um, **I've passed it on, slightly edited, to Paul Levy** [of Deutsche Bank].

* * *

- 14 -

Hajela:    Right, because the one editorial change that I made to the Euroclear information was that **I deleted all information vis-à-vis ABN AMRO.**

Long:    I didn't even realize on that email there was anything on that, oh I see, yes, yes, yes, no I'm rewriting an email to him.

**Partial Conversation Between Dan Hajela and Anthony Long June 10, 2003 4:46 p.m.**

Hajela:    **Because he [Paul Levy of Deutsche Bank] doesn't know anything about ABN AMRO -**

Long:    Still doesn't.

Hajela:    Nor does he know about, you know, whatever arrangements you have.

Long:    **He's not; he's not going to know about them at all is he first off?**

Hajela:    **No.**

Long:    **No.**

Hajela:    **He's not going to know anything about them —**

Long:    **No.** (emphasis in original) (FAC par. 115)

**Partial Conversation Between Anthony Long and Dan Hajela May 24, 2003 12:31 p.m.**

Long:    \*\*\* I also had conversations again yesterday with, with KBC [Capital's clearing agent]. . . . Their compliance lady . . . had one question that I didn't feel I was able to answer as conclusively as I would have liked to have done and I just want to pass that by you and get the clarity that she will need. Her question was, this before, **why was . . . why did Deutsche Bank not just match straight with ABN AMRO in Euroclear, why does KBC or indeed any other third party need to get involved?**

* * *

Hajela:    **. . . Deutsche Bank did not want this product to go to the U.S.**

* * *

Long:    So that's the reason, no other reason than that.

Hajela:    No other reason than that.

Long:    All right.

Hajela: In other words, **this is not to be offered to a U.S. Persons.**

**Partial Conversation Between Anthony Long and Dan Hajela May 16, 2003 2:53 p.m.**

Hajela: **. . . it's Deutsche's insistence upon using a non-U.S. broker/dealer, which brings you into the equation.** (emphasis in original) (FAC par. 109)

The Amended Complaint attempts to circumvent these undisputed facts by alleging that, notwithstanding the elaborate subterfuge to keep Eirles and Deutsche Bank from learning that a U.S. Person was in the chain of purchasers acquiring the Notes, Deutsche Bank in fact discovered this fact. While Deutsche Bank strongly disputes this allegation, it is irrelevant to the motion to dismiss. The issue is not whether Deutsche Bank learned there was a U.S. purchaser, but rather whether it intended to defraud that person or anyone else. The existence of a U.S. purchaser, in and of itself, does not transform an otherwise legal transaction into a fraudulent one. Since the restriction on sale was contractual, not legal, sale of the notes to a sophisticated, qualified purchaser, such as ABN, did not violate any law, rule or regulation.

Even assuming *arguendo* that at some point Deutsche Bank learned there was going to be a U.S. purchaser, there is no basis to conclude that Deutsche Bank sought to conceal any information from the United States broker-dealer or any other purchaser of the Series 42 Notes. As previously discussed, the Programme Memorandum, the Supplemental Programme Memorandum, the trust agreement and sales documents all disclosed the restriction on sale. ABN asserts that neither Eirles nor Deutsche Bank provided it with a Programme Memorandum. In fact, the Amended Complaint does not allege that Eirles or Deutsche Bank supplied ABN with any documentation relating to the Series 42 Notes. This is obviously true since neither Eirles nor Deutsche Bank dealt with ABN. ABN does not deny, however, that it had a copy of the Programme Memorandum or that it had access to all documents material to the transaction, nor does it assert that Eirles or Deutsche Bank took any steps to conceal the existence of these documents from ABN. The Amended Complaint actually demonstrates the opposite.

ABN admits that it received from Hopewell a copy of a document entitled "Diversified Credit Portfolio Note, Indicative Terms and Conditions of the DB Credit Debt Obligation (the 'Notes') subject to alterations" ("Indicative Note Term Sheet") early on. The Indicative Note

Term Sheet (App. Ex. B) made clear that a purchaser, such as ABN, should not rely on the Indicative Note Term Sheet in making an investment decision.

> THE ABOVE IS A SUMMARY OF THE INDICATIVE TERMS AND CONDITIONS OF A PROPOSED TRANSACTION AND DOES NOT INCLUDE ALL DEFINED TERMS. ALL THE INDICATIVE TERMS AND CONDITIONS ABOVE ARE SUBJECT TO CHANGE. THEREFORE NO RELIANCE SHOULD BE PLACED ON THIS SUMMARY, WHEN MAKING AN INVESTMENT DECISION. ANY PROSPECTIVE INVESTOR SHOULD RELY SOLELY ON THE FINAL PRICING SUPPLEMENT OR LOAN DOCUMENTATION, WHICH WILL CONTAIN THE FINAL TERMS AND CONDITIONS OF THE TRANSACTION, NOT ON THE SUMMARY ABOVE.

In addition, ABN admits that other term sheets which ABN also received prior to closing "reference[d] [the] 'Secured Note Programme', i.e., the 2002 Programme Memorandum." (FAC par. 203) Nevertheless, ABN does not allege that it asked to see a copy of the Programme Memorandum.

The fact that ABN did not request a copy of the Programme Memorandum after being put on notice of its existence, and ignored the Indicative Note Term Sheet's admonishment that the Indicative Note Term Sheet should not be relied upon in making an investment decision, cannot be attributed to Eirles or Deutsche Bank. Nor can it support any inference, and certainly not a strong inference, that Eirles or Deutsche Bank had a motive or intention to defraud ABN or anyone else. We have found no case or other authority supporting a claim of fraud by omission based on the provision of incomplete documentation by a third party.

**B.     Reliance: Since ABN Did Not Intend To Own The Notes, It Did Not Review Or Rely On The Terms And Conditions Of The Notes**

ABN contends that it never would have agreed to help facilitate Hopewell's purchase of the Notes if it had known that the Series 42 Notes were not to be sold in the United States. ABN contradicts this assertion throughout its Amended Complaint. It is apparent from ABN's behavior as set forth in the Amended Complaint that it agreed to act as principal in the transaction not in reliance on anything Eirles or Deutsche Bank said or did, but because parties other than Eirles and Deutsche Bank represented that ABN's "involvement would be structured as that of a 'riskless principal,' for the sole purpose of facilitating the transaction and pass through of the Series 42 Notes from Capital to Hopewell and on to the ultimate end purchasers." (FAC par. 3) Based on this understanding, ABN did not believe that it would be an ultimate

owner of the Notes. Consequently, ABN elected "not [to become] involved in the parties' substantive discussions regarding, or analysis of, the terms, characteristics or valuation of the Series 42 Notes." (FAC par. 151) ABN's decision to forgo the kind of due diligence expected of a reasonable person about to acquire $115 million in Notes was based solely on its alleged belief that its role would be limited and that Hopewell had a buyer for the Notes.

ABN's contention that it reasonably relied on and was misled by the Indicative Note Term Sheet, the Term Sheets, the Principal Letter Agreement with Capital, the Purchase Agreements between Capital and ABN, and the Bloomberg financial listing is belied by the very documents themselves. (FAC pars. 199-200; 203) Only the Indicative Note Term Sheet purported to include a summary of the terms of the offering. The Indicative Note Term Sheet, however, makes clear that the terms were just that, a summary, and were not to be relied upon. (App. Ex. B) ABN concedes that the Term Sheets referred to the Programme Memorandum. (FAC par. 203) The Programme Memorandum disclosed those terms which applied to all of the Secured Notes and directed the reader to the relevant Supplemental Programme Memorandum (App. Ex. I) for the specifics of each offering and any exemptions from the stated restrictions on sales to U.S. Persons. The Programme Memorandum also identified a litany of other documents relating to the Secured Note offerings which could be obtained free of charge, including the trust documents for each series of notes. (App. Ex. D, Programme Memorandum at p. 85) In light of ABN's sophistication, ABN's failure to review the Programme Memorandum and other relevant documents and ABN's decision to ignore the specific warning in the Indicative Note Term Sheet was highly unreasonable and negates any possible inference that ABN reasonably relied on the documents that it did review.

**C.    Materiality: The Alleged Sales Restriction Was Fully Disclosed And Was Not Material To ABN's Decision To Act As A "Riskless" Principal**

Rule 10(b)(5) case law provides that an alleged omission is not actionable unless there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Here there was no omission, but even if there were, the information ABN contends was omitted is immaterial as a matter of law.

ABN contends that it was a material omission for Eirles and Deutsche Bank not to have disclosed the restriction on sale in the United States. Eirles and Deutsche Bank in fact did disclose this restriction in several documents which ABN either received or elected not to obtain. The restriction was contained in the Hopewell-Sterling Purchase Agreement ABN received prior to settlement. (App. Ex. C) It also appeared in the Purchase Module documents that were available to ABN free of charge for the asking (App. Ex. F) and was apparent from the Programme Memorandum (App. Ex. D), the existence of which was disclosed to ABN in the Term Sheets it received. (App. Ex. G) To the extent ABN did not already have the Programme Memorandum, it was also available free of charge.

ABN contends that the Programme Memorandum does not adequately disclose the restriction on sale. This is an unsupported conclusion of law that is contrary to the plain language of the document. The Programme Memorandum unambiguously provides that a particular offering of Secured Notes will be sold in the United States only "as and to the extent specifically set forth in a Supplemental Programme Memorandum with respect to a particular Series of Notes or Alternative Investments." (App. Ex. D, Programme Memorandum at p. 78) The sales restriction is clearly stated and is absolute unless an exemption or exception is included in the Supplemental Programme Memorandum. No such exemption appeared in the Supplemental Programme Memorandum. *See* p. 6, *supra*.

ABN seeks to avoid the consequences of this disclosure by its claim that "the 2002 Programme Memorandum does not provide that a Supplemental Programme Memorandum will necessarily be issued for each series of Eirles Notes." (emphasis in original) (FAC par. 43) This allegation is disingenuous, to say the least. In the very same paragraph of the Amended Complaint, ABN admits that the "2002 Programme Memorandum provides that it 'should be read and construed in conjunction with each relevant Supplemental Programme Memorandum'...." Additionally, the Programme Memorandum makes clear on its facing page that each series of notes will be offered based "substantially on the terms set out [in the Programme Memorandum], as supplemented in respect of each issue by a memorandum supplementary hereto (each a 'Supplemental Programme Memorandum')." (App. Ex. I) There are approximately 80 references in the Programme Memorandum to the fact that there will be a Supplemental Programme Memorandum for each series of notes which must be reviewed to ascertain the actual terms and conditions of the offering of the particular note series.

Not only was the restriction on sale adequately disclosed, but ABN admits that the Programme Memorandum fully disclosed that the Secured Notes, to the extent that, like the Series 42 Notes, they were bearer notes, were not suitable investments for a U.S. purchaser due to the severe tax consequences that would result. (FAC par. 9) Consequently, even if the restriction on sale was not properly disclosed, which Eirles and Deutsche Bank deny, its omission did not materially alter the total mix of information available to investors. Anyone reading the Programme Memorandum would understand that the Notes, which were bearer notes, were not suitable investments for U.S. Persons.

ABN's decision not to review available documentation which included all material information cannot create an omission of a material fact. Simply put, according to its own Complaint, ABN never believed that it was going to hold the Notes. It expected merely to act as a conduit to assist its customer Hopewell to acquire the Notes. As a result, the terms and conditions of the Notes were not important to it. (FAC par. 151) ABN can not ignore information that would put it on notice of a risk and then complain that it was defrauded. Even if, as ABN contends, and Deutsche Bank and Eirles deny, that information was omitted from those documents on which ABN chose to rely, ABN was on notice from documentation it possessed that the Notes were not to be sold to a U.S. Person. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir 1985) ("If the investor knows enough so that the lie or omission still leaves him cognizant of the risk, then there is no liability. The investor cannot ask a court to focus on the lie and ignore the remaining pieces of information already available to him....").

**D.     Loss Causation: Any Economic Loss ABN Suffered By Reason Of Its Ownership Of The Notes Was Not The Result Of An Omission By Eirles Or Deutsche Bank**

The law requires that the alleged omission cause the economic loss for which recovery is sought. *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631, 161 L.Ed.2d 577, 585 (2005). The restriction on resale was not the cause of ABN's economic loss. ABN acquired the Series 42 Notes because Hopewell reneged on its promise to purchase the Notes from ABN. ABN purchased the Notes even though it knew before settlement and payment of any funds that Hopewell could not perform. ABN went forward with the transaction based solely on Hopewell's assurances that it had a buyer for the Notes. Hopewell did indeed have buyers for the Notes, according to ABN. ABN, however, was not able to consummate a sale because

Hopewell "reject[ed] bona fide purchasers of, and purchase offers for, the Series 42 Notes." (State Complaint par. 41) Any economic loss suffered by ABN thus flowed directly from its dealings with Hopewell.

ABN's conclusory assertion that the value of the $115 million in Notes was somehow lessened because there was a restriction on resale to U.S. Persons is baseless. As admitted, the restriction on sale was immaterial: the Notes would have been less valuable if sold to a U.S. Person because of the severe tax consequences.

ABN has not established that it was prohibited from reselling. Since ABN had never contractually agreed not to sell to a U.S. Person, there were no restrictions on ABN's ability to resell the Notes in the United States. ABN's purchase of the Notes did not violate federal or state securities laws. The sale from Capital to ABN was a private transaction between sophisticated investors, which is exempt from registration pursuant to Section 4 of the Securities Act of 1933 and Section 4 of the Illinois Securities Law of 1953. *Supra*, Argument I. Taking ABN's allegations as true for purposes of the motion to dismiss, the sale by Capital to ABN could be considered a violation by Capital of its contractual agreement with Deutsche Bank not to sell the Series 42 Notes to a U.S. Person. However, once Hopewell's default caused ABN to become the holder of the Notes, there was no prohibition on ABN's resale of the Notes to a qualified buyer in the United States.

Finally, the Amended Complaint does not identify when or to whom ABN sold the Notes, or whether the purchaser was a U.S. Person. Nor is there an allegation that market conditions did not cause the loss ABN allegedly suffered. (*See,* e.g., App. Ex. A, State Complaint par. 48: "on or about March 29, 2004, [before ABN sold the Notes] Fitch Ratings, the international ratings agency, downgraded the Series 42 notes from 'A' to 'BBB-'."). For this and the other reasons noted above, ABN has not adequately pleaded loss causation.

Based on the foregoing, it is apparent that the Amended Complaint fails to meet the heightened pleading standards of Fed.R.Civ.P. 9(b) for pleading fraud, let alone the requirements of the PSLRA. Accordingly, Count II of the Amended Complaint should be dismissed.

## III. ABN FAILS TO STATE A CLAIM FOR VIOLATIONS OF THE ILLINOIS SECURITIES ACT AGAINST EIRLES AND DEUTSCHE BANK ( Count IV)

Count IV of the Amended Complaint alleges a violation of Sections 12.F, 12.G and 12.I of the Illinois Securities Law of 1953 ("Illinois Securities Act"). These sections of the Illinois Act were modeled after Section 17(a) of the Securities Act of 1933. Illinois courts look to federal securities cases in interpreting these sections. *Tirapelli v. Advanced Equities, Inc.*, 351 Ill.App.3d 450, 455, 813 N.E.2d 1138, 1142 (1st Dist. 2004). Consequently, the above discussions concerning reliance, materiality and causation apply with equal force here and require dismissal as to both Eirles and Deutsche Bank.

ABN's Illinois Securities Act claim against Deutsche Bank also fails for another reason -- ABN failed to give timely notice to Deutsche Bank of its intent to void its purchase of the Series 42 Notes. In order to pursue a claim for violation of the Illinois Securities Act, a plaintiff must comply with Section 13.A of the Act, which states: "[E]very sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser exercised as provided in subsection B of this Section." Section B provides that the purchaser must give notice to each person from whom recovery is sought of an election pursuant to Section A within six months of attaining knowledge that the transaction is voidable.

The six month rule is not a statute of limitations. Instead, it is an equitable feature which was placed in the statute to protect against stale claims. It forces purchasers with knowledge of a violation of the Act to timely assert their remedy as opposed to waiting to the end of the full statute of limitations to determine if their investment was a good one or not. *766347 Ontario, Ltd. v. Zurich Capital Markets, Inc.*, 249 F.Supp.2d 974, 988 (N.D.Ill. 2003). Once the purchaser has knowledge, the purchaser must make an election within six months. *Reshal Associates, Inc. v. Long Grove Trading Co.*, 754 F.Supp 1226, 1236 (N.D.Ill. 1990). Moreover, the notice must specifically state that an election is being made pursuant to the Act. *Denten v. Merrill Lynch, Pierce, Fenner & Smith*, 887 F.Supp. 176, 180-81 (N.D.Ill. 1995).

ABN alleges that it knew by August 5, 2003 that its purchase of the Series 42 Notes was voidable. (FAC pars. 6, 269) It did not, however, provide written notice to Deutsche Bank of its Section A election until May 31, 2005, well after the six-month period required by the statute. (FAC par. 270) ABN attempts to excuse its failure to provide timely notice by alleging that prior to "on or about May 2, 2005, ABN AMRO was unaware of Deutsche Bank's participation in the

direct and/or indirect omissions of material fact to ABN AMRO, and was therefore, unaware of its remedy against Deutsche Bank until that time as well." (*Id.*) ABN's effort reveals a fundamental misunderstanding of the applicable legal principles and is directly contrary to controlling Illinois law.

In *Nicpon v. Goehausen*, 1991 WL 5866 (N.D.Ill. Jan. 15, 1991), plaintiffs, like ABN here, had timely sued the arranger of the alleged fraudulent sale of securities and subsequently sought to sue salespersons who had participated in the sale of those securities. The salespersons moved for summary judgment on the Illinois Act claim on the ground that plaintiffs, by initiating suit against the arranger, conceded they had knowledge of the voidability of the transaction more than 6 months prior to providing written notice to the salespersons. Plaintiffs, again precisely like ABN here, sought to excuse their failure to give notice by arguing that they were unaware of the participation of the salespersons in the fraudulent scheme. Judge Holderman curtly rejected that argument, stating:

> Once plaintiffs were aware of their transactions' voidability, they simply needed to read the provision allowing such remedy to ascertain that notice of intent to seek rescission could be directed to salespeople of Financial Concepts, including defendants. Section 13 declares that "each underwriter, dealer or *salesperson* who shall have participated or aided in any way in making such sale ... shall be jointly and severally liable to such purchaser." Ill.Rev.Stat. ch. 121 1/2, ¶ 137.13.A [now 815 ILCS 5/13A] (emphasis added in original). The statute defines "salesperson" as "an individual ... employed or appointed or authorized by a dealer, issuer or controlling person to offer, purchase or sell securities in this State." Ill. Rev. Stat. ch. 121 1/2 ¶ 137.2.9. Thus, the court finds that notice was due to defendants by October, 1988, six months after plaintiffs had knowledge that the sale of securities to them was voidable. Accordingly, plaintiffs' January 10, 1989 notice to rescind is ineffective in bringing plaintiffs in compliance with Section 13, and, as a result, their claim thereunder is barred. *Id*. at *3.

As is made clear on the face of the statute, as well as the case law construing Section 13.B, the six month notice requirement is triggered the moment plaintiff is aware of the transaction's voidability, which in this case ABN admits was no later than August 5, 2003. Once ABN believed that the transaction was voidable, it was required to provide the statutory notice within six months to each person whom Section 13 of the Illinois Securities Act identifies as potentially jointly and severally liable for a violation of the Act. *Nicpon* expressly so held. *Id.*, at *3. Thus, the only remaining question is when ABN first learned or should have realized that

Deutsche Bank was a potential party by reason of Deutsche Bank's participation in the issuance and sale of the Notes.

Section 13.A of the Illinois Securities Act provides a potential remedy against each "underwriter, dealer or salesperson who shall have participated or aided in any way in making the sale." Although under certain circumstances the issue as to when a plaintiff first realized that a sale is voidable against a particular potential defendant is a mixed question of law and fact, here ABN admits in its correspondence and pleadings that it had knowledge that the sale was voidable roughly 22 months before providing Deutsche Bank with the requisite notice.

More specifically, ABN admits that it received the Indicative Note Term Sheet on Deutsche Bank letterhead on May 2, 2003. (FAC par. 146) The Indicative Note Term Sheet stated that it was "prepared by Deutsche Bank A.G. for information and discussion purposes." (*Id.*) It is beyond dispute that if the transaction was voidable, the Indicative Note Term Sheet identified Deutsche Bank as a possible participant.

ABN admits that on July 15, 2003, the Series 42 Notes were listed on Bloomberg, "the leading supplier of information on the financial markets." (FAC par. 204) ABN asserts that it relied on the Bloomberg notice in deciding to act as principal. (FAC par. 205) Bloomberg identifies Deutsche Bank as the "BOOK RUNNER" for the transaction. (FAC Ex. 10) As ABN well knows, a book runner is a lead underwriter for a securities offering. Under these circumstances it is not possible that ABN did not understand on August 5, 2003 that Deutsche Bank was a participant under the Act.

On August 5, 2003, ABN received the Series 42 Supplemental Programme Memorandum which prominently identified Deutsche Bank as the "Arranger" of the Series 42 issue. (FAC par. 206; App. Ex. I, Supplemental Programme Memorandum at p. 1) The Supplemental Programme Memorandum further disclosed that "Deutsche Bank AG London and/or its affiliates are acting in various capacities in relation to the Notes, including, without limitation, as Arranger, Swap Counterparty, Agent, Paying Agent, Custodian and as a party to the Service Agreement." (Supplemental Programme Memorandum at p. 2) The Supplemental Programme Memorandum also makes clear that Deutsche Bank could be a seller of the Notes. (*Id.* at pp. 21-22) Once again, ABN had that information over six months before it provided notice to Deutsche Bank.

On October 4, 2004, Peter E. Q. Long, the Chairman of defendant Capital, filed and served on counsel for ABN a declaration in support of Capital's Fed.R.Civ.P. 12(b)(2) motion to

dismiss that described in detail Deutsche Bank's role in the issuance and distribution of the Series 42 Notes and stated that the Notes were "issued by arrangement with Deutsche Bank"; that Deutsche Bank purchased the Notes from Eirles and "transferred the Notes into the account of Capital's Euroclear settlement agent"; and that Capital facilitated "the transfer of the Notes from Deutsche Bank to Hopewell." Thus again, ABN received notice of Deutsche Bank's involvement over six months before it gave notice.

ABN's own correspondence and filings in this case also establish that ABN believed more than six months before it provided notice to Deutsche Bank that Deutsche Bank was a party from which it could seek relief:

> First, on September 29, 2003, Tern de Swann, a member of the Managing Board of ABN's parent in the Netherlands, wrote to Clemens Borsig, Chief Financial Officer of Deutsche Bank in Frankfurt, Germany, that "this past summer, **Deutsche Bank (UK) structured and underwrote** $115MM in credit-linked notes called **the EIRLES FOUR Series 42 ("Notes")**." (emphasis supplied) (App. Ex. J)

> Second, on September 3, 2004, in a memorandum filed in this court entitled "ABN AMRO Inc.'s Motion for Leave to Obtain or Conduct Jurisdictional Discovery..." ABN stated that "AAI [ABN] should be entitled to take discovery relating to the relationship between Eirles and Capital and **any other entities in the distribution chain, such as Deutsche Bank**...." (emphasis supplied)

> Third, on October 5, 2004, in a reply memorandum filed in this court in support of its motion to conduct jurisdictional discovery, ABN argued that Deutsche Bank was an agent of Eirles in the sale of the Series 42 Notes and that ABN was entitled to "discovery relating to the relationship between Eirles, Capital and Deutsche Bank."

> Fourth, on November 5, 2004, in its Status Report filed with this court, ABN stated that it would "seek document discovery of Deutsche Bank AG London, the 'arranger' for the Eirles Notes."

Each of these admissions demonstrates that ABN knew for more than six months prior to the time it gave notice that Deutsche Bank was a potential party to its claim. Consequently, since ABN failed to provide written notice to Deutsche Bank until May 31, 2005, ABN's Illinois Securities Act claim must be dismissed as to Deutsche Bank.

## IV.    ABN FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD (Count V)

Count V of the Amended Complaint alleges that defendants' failure to inform ABN of the selling restriction constituted a common law fraud under Illinois law. The elements of a cause of

action for fraud in Illinois are (1) a false statement of material fact; (2) known or believed to be false by the party making the statement; (3) an intent to induce the other party to act; (4) justifiable reliance by the other party; and (5) damage as a result of that reliance. *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 402 N.E.2d 599, 601 (1980). The common law elements of scienter, materiality, reliance and damage are essentially identical to those discussed above in Argument II with respect to the 10b-5 analysis. For the reasons stated in that analysis, ABN's cause of action for common law fraud should be dismissed.

## V.     ABN FAILS TO STATE A CLAIM FOR VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT (Count VI)

Count VI of the Amended Complaint alleges a violation of the Illinois Consumer Fraud Act. ABN lacks standing to sue under the Act because ABN is not a "consumer" within the meaning of the Act and the sale of a single Note to ABN does not implicate consumer concerns. Under the Act, a consumer is defined as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). ABN is a commercial plaintiff that purchased the Notes for resale in the ordinary course of its business. *See Prime Leasing, Inc. v. Kendig*, 332 Ill.App.3d 300, 313, 773 N.E.2d 84, 95-96 (1st Dist. 2002) (brokerage firm which purchased stocks in the ordinary course of business is not a "consumer" and thus lacked standing to sue under the Act).

Nor does ABN have standing to sue under the Act as a "person" authorized to maintain an action pursuant to 815 ILCS 505/10a. The courts have uniformly held that a purported fraud is not actionable under the Act unless it is of sufficient magnitude to affect the market generally and thus likely to harm consumers. *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 579 (7th Cir. 2004). A business that is not a consumer may bring suit under the Act only if it can demonstrate that it is a surrogate for consumer interests and that the complained-of conduct implicates consumer protection concerns. *Speakers of Sport, Inc. v. Proserv, Inc.*, 178 F.3d 862, 868 (7th Cir. 1999). Here, the transaction cannot be said to have affected "consumer" interests or the market generally. Sale of the Series 42 Notes involved a single transaction consisting of the

purchase of a single Note -- the only series of Notes sold in the United States. Neither the Illinois market generally nor the interests of Illinois consumers generally were implicated.[7]

## VI. ABN FAILS TO STATE A CLAIM FOR UNJUST UNRICHMENT AGAINST DEUTSCHE BANK (Count VII)

ABN attempts to state a cause of action for unjust enrichment against Deutsche Bank by alleging that the "agreed-upon price ABN AMRO paid was significantly inflated because the Series 42 Notes could not be offered, sold, resold, delivered or transferred within the United States or to, or for the account or benefit of, U.S. Persons." (FAC par. 301) This claim is identical to ABN's claims for federal and state securities fraud and common law fraud and therefore, as a matter of law, it is subsumed in those claims. In addition, ABN's recklessness in failing to conduct due diligence and in ignoring clear warnings that the Notes were not to be sold to U.S. Persons prevents it from pursuing this claim based on the doctrine of unclean hands.

ABN attempts to assert a claim for unjust enrichment to get around the stringent pleading and proof requirements of a cause of action for fraud. Illinois courts reject this subterfuge. Where the basis of a claim for unjust enrichment is the same as fraud charges raised elsewhere in the complaint, the unjust enrichment is subsumed in the fraud count. *See Charles Hester Enter., Inc. v. Ill. Founders Ins. Co.*, 137 Ill. App. 3d 84, 90-91, 484 N.E.2d 349, 354-355 (5th Dist. 1985) (where the alleged acts giving rise to a claim of unjust enrichment form the basis of a separate claim made elsewhere in the complaint, such as fraud, the unjust enrichment claim becomes subsumed in the other and must be dismissed), *aff'd* 114 Ill.2d 278, 499 N.E.2d 1319 (1986); *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 638, 69 Ill.2d 320, 328 (1977).

ABN's unjust enrichment claim also fails under the general principle that he who comes into a court of equity must come with clean hands. *TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822, 829 (7th Cir. 1998). "An unjust enrichment claim or other equitable relief is denied to a plaintiff whose recklessness caused his claimed injury." *Id.*, *citing United States v. Burczyk*, 556 F.2d 394, 397 (7th Cir. 1977). ABN, an extremely sophisticated purchaser, deliberately chose not to engage in any meaningful due diligence and to ignore warnings that the Notes were subject to sales restrictions when it agreed to Hopewell's request to

---

[7] ABN's FAC par. 295 attempts to plead purported facts demonstrating harm to Illinois consumers generally. But since no other Eirles notes were ever sold in the U.S., there is absolutely no factual predicate for the assertion. For purposes of a 12(b)(6) motion, "mere unsupported conclusions of fact" are not admitted. *Northern Trust Co. v. Peters*, 69 F.3d 123, 129 (7th Cir. 1995).

act as a principal. ABN behaved in this reckless manner because it did not expect Hopewell, its client, to default and hence, it never believed that it would become an owner of the Notes. (FAC pars. 3, 150-151) ABN's decision to ignore customary due diligence procedures created the alleged information gap and bars an unjust enrichment claim. *See TRW Title Ins. Co.*, 153 F.3d. at 829 ("If the unclean hands defense tells us one thing, it is that equity doesn't find a benefit unjust where a plaintiff, through his own misconduct, intentionally places himself at risk. To allow an unjust enrichment claim in these circumstances would be to convert this equitable action into an insurance policy for those who gamble by avoiding safeguards they know they should take.") Similarly, even after learning that Hopewell would not close, ABN elected to affirm the transaction and buy the Notes. That decision was especially reckless.

## VII. ABN FAILS TO STATE CLAIMS FOR NEGLIGENT MISREPRESENTATION AGAINST EIRLES AND DEUTSCHE BANK (Counts VIII and IX)

The elements of a claim for negligent misrepresentation consist of: (i) a false statement of material fact; (ii) carelessness or negligence in ascertaining the truth of the statement by the party making it; (iii) an intention to induce the other party to act; (iv) action by the other party in reliance on the truth of the statement; and (v) damage to the other party resulting from such reliance; (vi) when the party making the statement is under a duty to communicate accurate information. *Fox Assocs., Inc. v. Robert Half Int'l, Inc.*, 334 Ill. App. 3d 90, 94, 777 N.E.2d 603, 606 (1st Dist. 2002). For the reasons discussed in Argument II, *supra*, of this memorandum, ABN has failed to plead facts sufficient to demonstrate that Deutsche Bank or Eirles made a negligent misrepresentation in connection with the sale of the Series 42 Notes. There was no false statement of material fact; no intent that ABN rely; no reliance by ABN; and the damage, if any, resulted from Hopewell's alleged actions just as ABN alleges in the State Complaint.

In addition to pleading the elements for negligent misrepresentation, which ABN has failed to do, a plaintiff must demonstrate both that (i) the defendant is in the business of supplying information and (ii) the information supplied was provided to plaintiff for his business transactions with third parties, not for transactions with the defendant. *Equity Builders & Contractors, Inc. v. Russell*, 2005 WL 2664243, at *6 (N.D. Ill. Oct. 17, 2005) (slip op.). ABN's Amended Complaint falls far short of meeting either requirement.

First, "[A]n allegation that defendant is in the business of providing information for the guidance of others is a legal conclusion that plaintiff must support with well-pleaded factual

allegations." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 28, 719 N.E.2d 288, 296 (1st Dist. 1999); *see also Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 2005 WL 843297, at *8 (N.D. Ill. Jan. 20, 2005) (despite "lenient" federal notice pleading standard, claim for negligent misrepresentation was dismissed where plaintiff merely pled legal conclusions). ABN's sole pleading in that regard is the conclusory and unsupportable allegation that "each of the Defendants is in the business of supplying information for the guidance of others with regard to securities transactions (including the transaction involving the sale of the Series Notes)." (FAC pars. 315, 347) This pleading is insufficient as a matter of law.

Moreover, the fact that the alleged negligent misrepresentations were made in connection with ABN's own purchase of the Notes also precludes recovery. While parties to a commercial transaction may exchange information in the course of their dealings, if the end result is that plaintiff acquires a tangible object, as opposed to ideas, the defendant will not be found to have engaged in the business of supplying information for purposes of the negligent misrepresentation exception. *See Tolan & Son*, 308 Ill. App. 3d at 29-30, 719 N.E.2d at 297-98; *Fox Assocs.*, 334 Ill. App. 3d at 94-95, 777 N.E.2d at 607-08; *Trans Helicopter Service v. Jet Support Services, Inc.*, 2004 WL 725700, at *5 (N.D. Ill. Mar. 30, 2004); *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*,355 Ill. App. 3d 546, 561-562, 823 N.E.2d 168, 182 (1st Dist. 2005). Specifically, where a plaintiff complains about the quality or value of an object it acquires, such as ABN's complaint in this case concerning the value of the Series 42 Notes, there is no cause of action for negligent misrepresentation. *See In re Caremark International, Inc. Securities Litigation*, 1996 WL 238820, at *4 (N.D. Ill. Apr. 30, 1996), *citing Liebhard v. Square D Co.*, 1991 WL 206169, at *3 (N.D. Ill. Oct. 1, 1991); *Johnson v. Mutual Savings Bank*, 1996 WL 79414, at *6 (N.D. Ill. Feb. 21, 1996).

Second, ABN's claims for negligent misrepresentation are also insufficient because the information provided was used by ABN in its decision to acquire the Notes for its own account. ABN alleges that it would not have "purchased, executed, settled or accepted delivery of any of the Series 42 Notes" but for the alleged negligent misrepresentations of Eirles and Deutsche Bank. (FAC par. 321) Since the alleged negligent misrepresentations were purportedly utilized by ABN in making its own investment decision, a claim for negligent misrepresentation cannot be sustained. A defendant is not in the business of supplying information if the information provided was meant to guide plaintiff in making its own investment decision in a specific

transaction rather than for use in plaintiff's business relations with third parties. *See Rankow v. First Chicago Corp.*, 870 F.2d 356, 362-63 (7th Cir. 1989); *First Midwest Bank* 355 Ill. App. 3d at 557, 823 N.E. 2d at 178; *Birnberg v. Milk St. Residential Assocs. Ltd. P'ship*, 2003 WL 151929, at *20 (N.D. Ill. Jan. 21, 2003); *Equity Builders & Contractors*, 2005 WL 2664243, at *7 ("Where, as here, the primary purpose of the information supplied is to guide purchasers in making their decisions about buying the end product *from the same actors*, the seller is not in the business of supplying information.") (emphasis added). For these reasons, ABN's claims of negligent misrepresentation against Eirles and Deutsche Bank should be dismissed.

## VIII. A SEPARATE CAUSE OF ACTION DOES NOT EXIST FOR ALTER EGO LIABILITY (Count X)

ABN asserts alter ego liability as a separate cause of action, which is not permissible under Illinois law. *See Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527, 778 N.E.2d 291, 294-295 (2d Dist. 2002). When a party seeks to pierce the corporate veil of a corporation by alleging that it is the alter ego, or instrumentality, of another entity, it must do so as part of an underlying (tort or contract) cause of action. *See id.* (citation omitted). This is because piercing the corporate veil is an equitable remedy that serves as a means of imposing liability on a company for the wrongdoing of an affiliated company. *See id.* Accordingly, ABN's attempt to plead "alter ego" as a separate claim must be dismissed.

## CONCLUSION

By its own admission, ABN agreed to act as principal to facilitate Hopewell's acquisition of the Series 42 Notes. ABN undertook no due diligence and ignored the relevant transaction documents that clearly revealed the allegedly omitted information. ABN's claim that it was defrauded by Eirles and Deutsche Bank is based on an Indicative Term Sheet, which was provided by a third party; warns that it is incomplete; and directs the reader to the relevant complete documentation. The documents cited and relied upon in the Amended Complaint demonstrate that Eirles and Deutsche Bank made appropriate and full disclosure and that ABN is unable to meet state law, Fed.R.Civ.P. 9(b), or PSLRA pleading standards. The Amended Complaint should be dismissed with prejudice. In addition, pursuant to the express terms of the PSLRA, 15 U.S.C. § 78u-4(c)(3), Eirles and Deutsche Bank should be awarded their attorneys' fees in defending this abusive litigation.

**Dated:** March 6, 2006

- 30 -

Respectfully submitted,

/s/ Jerrold E. Salzman
*One of the Attorneys for Eirles Four Limited and*
*Deutsche Bank Aktiengesellschaft*

Jerrold E. Salzman
Phillip L. Stern
Richard P. Campbell
Freeman, Freeman & Salzman P.C.
401 N. Michigan Avenue
Suite 3200
Chicago, Ill. 60611
Tel: 312-222-5100
Fax: 312-822-0870