**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ABN AMRO, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.:  04-CV-3123 |
| | ) | |
| CAPITAL INTERNATIONAL LIMITED, | ) | Judge Robert M. Dow, Jr. |
| EIRLES FOUR LIMITED, DEUTSCHE BANK | ) | |
| AKTIENGESELLSCHAFT, SARCO | ) | |
| HOLDINGS, and DHANANJAY (DAN) | ) | |
| HAJELA, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On November 1, 2005, ABN AMRO, Inc. ("ABN") filed a first amended complaint [85]

against Deutsche Bank Aktiengesellschaft ("Deutsche Bank"), Eirles Four Limited ("Eirles"),

Capital International Limited ("Capital"), Sarco Holdings ("Sarco"), and Dhananjay Hajela

("Hajela"), alleging securities fraud and other state and federal claims in connection with a chain

of back-to-back sales of secured notes issued by Eirles ("Series 42 Notes").  ABN claims that

Defendants' collective omission of material information about the Series 42 Notes – specifically,

that there was an absolute restriction on their sale within the United States or to a U.S. person –

led to ABN's purchase of the Notes, and that ABN suffered $44 million in damages because of

this omission.  The ten-count Complaint alleges violations of federal and state securities laws

(Counts I, II, III, and IV), common law fraud (Count V), violations of the Illinois Consumer

Fraud and Deceptive Business Practices Act (Count VI), unjust enrichment (Count VII),

negligent misrepresentation (Counts VIII and IX), and "alter ego liability" (Count X).

Eirles, as well as Sarco and Hajela ("Sarco/Hajela"), have filed motions to dismiss for

lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) [127, 166]. Eirles

and Deutsche Bank ("Eirles/Deutsche Bank") and Sarco/Hajela also have filed motions to

dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) [124, 163].

Capital has filed an answer [123] to the first amended complaint and is not subject to this

opinion. For the reasons discussed below, the Court finds that it has personal jurisdiction over

all of the nonresident Defendants. The Court also finds that Plaintiff has adequately stated a

claim on all counts of its first amended complaint. Therefore, the Court respectfully denies

Defendants' motions to dismiss.

## I.      Factual Background[1]

This case arose out of the alleged botched sale of the Series 42 Notes, worth an estimated

$105 million. FAC ¶¶ 1, 5. The Notes were to be issued by Eirles and its issuing agent,

Deutsche Bank, and Plaintiff alleges that Sarco acted as Deutsche Bank and Eirles' sales agent to

arrange purchasers for the Notes. *Id.* ¶ 1. According to the original plan for the issuance, Eirles

and Deutsche Bank were to issue the Notes to Capital, a broker-dealer in the Isle of Man, which

was to distribute the Notes to ABN. *Id.* ¶ 5. ABN then planned to sell the Notes to its customer,

Hopewell Capital Group, Inc. ("Hopewell"), a U.S. broker-dealer, which planned to sell them to

Sterling Capital Management ("Sterling"), another U.S. broker-dealer, and other end purchasers.

*Id.*

---

[1]  The following facts are taken from Plaintiff's first amended complaint ("FAC"). For present purposes,
the Court accepts the allegations in the complaint as true. See, *e.g.*, *Singer v. Pierce & Assocs., P.C.*, 383
F.3d 596, 597 (7th Cir. 2004). At this juncture, the Court takes no position on whether any of the
allegations are, in fact, well founded.

Initially, ABN planned to act only as a clearing agent in the transaction. *Id.* ¶ 3. At Capital's insistence, however, ABN agreed to act as a principal for Hopewell, guaranteeing Hopewell's purchase of the Series 42 Notes, because neither Capital nor Hopewell could afford to finance the transaction. *Id.*

All parties to the transaction allegedly agreed that ABN would act as a "riskless principal," which meant it would serve only as a "pass through" for the Notes between Capital and Hopewell. *Id.* ABN expected its role to be minimal – allegedly little more than that of a clearing broker. *Id.* ABN's only interest in the transaction was the payment of a regular clearing fee. *Id.* ABN entered into a Principal Letter Agreement with Capital, which ABN alleges confirmed that the Series 42 Notes were exempted securities, and ABN also received copies of term sheets drafted by Deutsche Bank. *Id.* ¶ 4. ABN alleges that none of the documentation ABN received regarding the Notes mentioned any restrictions on the sale of the Notes. *Id.*

The Series 42 Notes were issued on July 15, 2003, and on that same day were distributed from Eirles to Deutsche Bank, through Capital, to ABN in a series of virtually simultaneous transactions. *Id.* ¶ 5. However, the remaining parties in the chain of distribution reneged on the deal, and ABN was left holding the Notes, for which it had paid $97.9 million. *Id.* Weeks after the deal fell through, while ABN was working with Hopewell and others to arrange for another buyer of the Notes, ABN received for the first time a copy of a Series 42 Supplemental Programme Memorandum, which governed the Series 42 Notes. *Id.* ¶ 6. ABN alleges that the original Programme Memorandum contemplated sales of the Notes in the United States. *Id.* ¶ 9. The Supplemental Memorandum, however, allegedly revealed to ABN for the first time that the Series 42 Notes were restricted from being "offered, sold, resold, delivered or transferred within the United States or to, or for the account or benefit of, U.S. persons." *Id.* ¶ 6. ABN alleges that

it would not have participated in the transaction if it had been aware of this "absolute restriction." *Id.* ¶ 7. After much difficulty, ABN ultimately sold the Notes for forty-seven cents on the dollar, resulting in a loss exceeding $44 million. *Id.*

ABN commenced this action against Eirles and Capital for alleged violations of Sections 5 and 12 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1), among other claims. *Id.* ¶ 8. ABN also filed suit in state court against Hopewell, Sterling, and their principals. *Id.* During jurisdictional discovery in the federal case, ABN alleges that it discovered a larger fraudulent scheme by Eirles, Deutsche Bank, Capital, Sarco, and Sarco's sole shareholder, officer, and director, Dan Hajela. *Id.* In its first amended complaint, ABN alleges that, from the inception of the transaction to its completion, Eirles and Deutsche Bank, and their agents Capital and Sarco, engaged in a fraudulent scheme to distribute the Series 42 Notes into the United States without disclosing the relevant absolute prohibition on such distribution. *Id.* ¶ 12

## II.     Discussion of Rule 12(b)(2) Motions to Dismiss for Lack of Personal Jurisdiction

### A.      Legal Standards

In a motion to dismiss claims under Rule 12(b)(2), "[t]he plaintiff bears the burden of demonstrating personal jurisdiction." *Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir. 2000) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997)). The Court draws all reasonable inferences consistent with the complaint in the plaintiff's favor. See *Quantum Color Graphics, LLC v. Fan Ass'n Event Photo GmbH*, 185 F. Supp. 2d 897, 904 (N.D. Ill. 2002) (citing *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999)).

When the Court rules on a defendant's motion to dismiss for lack of personal jurisdiction based on the submission of written materials, "the plaintiff need only make out a *prima facie* case of personal jurisdiction," *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (collecting cases; internal quotations omitted), but the Court may consider affidavits submitted by the parties, see, *e.g.*, *RAR, Inc.*, 107 F.3d at 1275; *Zurich Capital Mkts. v. Coglianese*, 388 F. Supp. 2d 847, 855 (N.D. Ill. 2004). In fact, if the defendant submits affidavits or other evidence in opposition, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Research*, 338 F.3d at 783. The Seventh Circuit instructs that "[i]n evaluating whether the *prima facie* standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Id.* at 782 (quoting *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)). "Any conflicts in the pleadings and affidavits are to be resolved in the plaintiffs' favor, but the court accepts as true any facts contained in the defendants' affidavits that remain unrefuted by the plaintiffs." *Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 904 n.3 & 905 (N.D. Ill. 2003) (collecting cases); accord, *e.g.*, *RAR, Inc.*, 107 F.3d at 1276.

**B.     *Prima Facie* Showing of Personal Jurisdiction**

*1.     General principles of personal jurisdiction*

This case involves both federal and state claims. The Seventh Circuit has held that in federal question cases, a plaintiff must establish two things to demonstrate personal jurisdiction over a defendant. In cases involving statutes that provide for nationwide service of process, the plaintiff must demonstrate that (i) haling the defendant into court accords with the Due Process Clause of the Fifth Amendment, and (ii) the defendant is amenable to service of process from the

court.  See, *e.g.*, *United States v. De Ortiz*, 910 F.2d 376, 381-82 (7th Cir. 1990) (citation omitted); see also *Perry v. Delaney*, 5 F. Supp. 2d 617, 619 (C.D. Ill. 1998); *Lifeway Foods, Inc. v. Fresh Made, Inc.*, 940 F. Supp. 1316, 1318 (N.D. Ill. 1996).

The federal securities acts at issue here provide for nationwide service of process, 15 U.S.C. §§ 77v, 78aa, and Defendants do not appear to be specifically challenging service on those claims.  To be clear, however, when a federal statute that creates a cause of action prescribes its own rules for service of process, "the Federal Rules provide that service made according to the statute is effective to establish personal jurisdiction over the defendant, regardless of whether a court of the state encompassing the federal district could exercise personal jurisdiction over the defendant."  *Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 807 n.3 (7th Cir. 2002) (citing Fed. R. Civ. P. 4(k)(1)(D) and collecting cases).  In such a case, the personal jurisdiction analysis turns on whether the defendant has certain minimum contacts with the United States as a whole, such that this Court's exercise of personal jurisdiction over the defendant would not violate the Due Process Clause of the Fifth Amendment.  *Id.*  (collecting cases); see also *Central States, S.E. and S.W. Areas Pension Fund*, 230 F.3d at 946 n.10.

With respect to ABN's state law claims, this Court has personal jurisdiction if an Illinois court would have jurisdiction.  See *Purdue Research*, 338 F.3d at 779.  There are three inquiries concerning personal jurisdiction that generally must be considered: (i) state statutory law, (ii) state constitutional law, and (iii) federal constitutional law.  See *RAR, Inc.*, 107 F.3d at 1276.  In Illinois, however, the personal jurisdiction statute has extended its jurisdiction to the limits permitted by the due process guarantees of the federal and state constitutions, 735 ILCS 5/209(c), and therefore the Illinois statutory and constitutional inquiries essentially collapse into the Illinois constitutional inquiry.  That means the Court need only consider whether an assertion

of personal jurisdiction over Defendants would comport with state and federal constitutional standards.  See *RAR, Inc.*, 107 F.3d at 1276 (under Illinois law, the personal jurisdiction analysis applicable for federal district court sitting in diversity "collapse[s] into two constitutional inquiries – one state and one federal").  The Illinois Supreme Court has stated that the federal and Illinois Due Process Clauses are distinct, see *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990), but as the Seventh Circuit has noted, Illinois courts have provided little concrete guidance, if any, about what differences exist between the state and federal due process standards.  See *RAR*, 107 F.3d at 1277 ("We are unaware of – and the parties have not cited – any Illinois case decided on state constitutional grounds that deals with this question.").  Because federal courts are naturally "hesitant to venture unguided into Illinois state constitutional law," *id.*, precedent has foregone the opportunity to speculate about how Illinois law might address such questions.  *Id.*  Therefore, to the extent that the Court analyzes whether it could assert personal jurisdiction over Defendants, the analysis will proceed in relation to the federal Due Process Clause.  See *id.*

Personal jurisdiction can be found in either of two forms, general or specific.  Plaintiff does not assert general jurisdiction over any Defendants, nor is it likely that it could have done so.  General jurisdiction over a defendant allows a defendant to be sued in the putative forum regardless of the subject matter of the litigation, see *Purdue Research*, 338 F.3d at 787, and the constitutional requirement for general jurisdiction is "considerably more stringent" than that required for specific jurisdiction.  *Id.*  A finding of general jurisdiction must be based on defendant's "continuous and systematic general business contacts" with the forum state.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).  These contacts must be "so extensive as to be tantamount to [defendant] being constructively present in the

7

state." *Purdue Research*, 338 F.3d at 787. Because Plaintiff does not assert general jurisdiction over Defendants, the Court does not reach the issue and instead focuses its analysis on whether there is specific jurisdiction.

A court sitting in Illinois has specific personal jurisdiction over a nonresident defendant consistent with due process if two conditions are satisfied: the defendant must have (i) minimum contacts with the state such that (ii) exercising personal jurisdiction does not offend traditional notions of fair play and substantial justice. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987) (internal quotation marks and citation omitted); see also *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

First, the defendant must have "minimum contacts" with Illinois such that the defendant has purposely availed itself of "the privilege of conducting activities within [Illinois], thus invoking the benefits and protections of its laws." *Asahi*, 480 U.S. at 109 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (internal quotation marks omitted); see also *International Shoe Co.*, 326 U.S. at 316. The defendant, rather than the plaintiff or a third party, must create the contacts. See, *e.g.*, *Purdue Research*, 338 F.3d at 780. "This requirement ensures that a defendant's amenability to jurisdiction is not based on fortuitous contacts, but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue." *Id.* Moreover, where a plaintiff asserts that this Court has specific personal jurisdiction over a nonresident defendant, the cause of action asserted by the plaintiff must "arise out of" or be "related to" the contacts that occurred in Illinois. See, *e.g.*, *Hyatt v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002); see also *Burger King*, 471 U.S. at 472. The exercise of jurisdiction in such a case is proper based on a state's interest in providing its residents with a convenient forum for redressing injuries inflicted by nonresidents. See *Burger King*, 471 U.S. at 473. It also reflects a

sense that out-of-state individuals who derive economic benefit from their activities in a state should have to account for the consequences of their acts within that state. *Id.* at 473-74. The nonresident defendant's activities in the forum state must be substantial enough, however, that he should have reasonably foreseen being haled into court there. *Id.* at 474. But as long as the defendant purposefully directed his business efforts toward the other state, the actual physical presence of the defendant in that state is not necessary. *Id.* at 476. Moreover, if a substantial connection is made with the forum, even a single act can support jurisdiction. *Id.* at 476 n.18.

Second, compelling the defendant to litigate in Illinois also must not offend "traditional notions of fair play and substantial justice." *Asahi*, 480 U.S. at 113; *International Shoe Co.*, 326 U.S. at 316. In this regard, assertion of jurisdiction must be reasonable in light of the burden it would place on the defendant, the plaintiff's interest in obtaining relief, the interests of Illinois, the judicial system's interest in efficient resolution of controversies, and the "shared interest of the several States in furthering fundamental substantive social policies." *Asahi*, 480 U.S. at 113. In this case, Plaintiff does not assert personal jurisdiction over Defendants Eirles based on that entity's own contacts with Illinois; instead, Plaintiff argues that Eirles' agents and subagents' contacts with Illinois, all of which are related to the claims in this case, are attributable to Eirles. With respect to Sarco and Mr. Hajela, there appears to be a factual dispute over whether these two Defendants had direct contact with Plaintiff in Illinois; however, Plaintiff also asserts personal jurisdiction over Sarco and Mr. Hajela based on the contacts of their agents with Plaintiff in Illinois. In response, Defendants argue that even if the agency relationships alleged by Plaintiff existed, the putative agents were acting outside the scope of their authority when they induced ABN to enter the Series 42 Notes transaction as a principal.

As discussed in detail below, the forum-related activities of an agent and a subagent are

imputable to the principal and are counted as the principal's contacts for jurisdictional purposes. See *Master Tech Products, Inc.*, 181 F. Supp. 2d 910, 913 (N.D. Ill. 2002). Furthermore, Plaintiff has stated a *prima facie* case of agency. Finally, the alleged agents have sufficient minimum contacts with Illinois such that haling them into court for claims based on those contacts does not violate Due Process. It follows that this Court has personal jurisdiction over all of the Defendants in this case.

2.      *Personal jurisdiction based on agency*

As stated above, in Illinois an agent's contacts with a state may be attributed to the principal for purposes of establishing personal jurisdiction. See *Master Tech Products, Inc.*, 181 F. Supp. 2d at 913 ("The Illinois long-arm statute expressly authorizes personal jurisdiction over a person for acts done 'through an agent.'") (quoting 735 ILCS 5/2-209(a)). The parties do not argue whether federal or state agency law applies, but the federal common law of agency is similar to Illinois agency law, and both accord with the Restatement of Agency. See *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) (collecting cases). All of these authorities recognize that, to bind the principal, the agent must have either actual or apparent authority, or the principal must ratify the agent's unauthorized actions. See, *e.g.*, *Anetsberger v. Metropolitan Life Insurance Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994).

Actual authority may be express or implied. *Opp*, 231 F.3d at 1064 (quoting *C.A.M. Affiliates, Inc. v. First American Title Ins. Co.*, 306 Ill. App. 3d 1015, 1021 (1st Dist. 1999)). An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act. *Id.* An agent has implied authority for the performance or transaction of anything reasonably necessary to effect execution of his express authority. *Id.* In other words, implied authority is actual authority that is implied by facts and circumstances and it may

10

be proved by circumstantial evidence.  *Id.*  Only the words or conduct of the alleged principal, not the alleged agent, establish the authority of the agent.  *Id.* (quoting *C.A.M. Affiliates, Inc.*, 306 Ill. App. 3d at 1021 ).

Moreover, under the doctrine of apparent authority, a principal will be bound not only by the authority that it actually gives to another, but also by the authority that it appears to give. *Opp*, 231 F.3d at 1065 (citing *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999)).  "'Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf.'"  *Id.* (quoting *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App. 3d 383, 390 (1st Dist. 1991)).

Where an agent has acted outside the scope of his authority, "a principal may ratify the act or render it obligatory upon himself, and such subsequent assent and ratification is equivalent to original authority and confirms that which originally was unauthorized."  *American Ins. Co. v. Meyer Steel Drum*, 1990 WL 92882, at *3 (N.D. Ill. June 27, 1990) (quoting *Advance Mortg. Corp. v. Concordia Mut. Life Ass'n*, 135 Ill. App. 3d 477, 484 (1st Dist. 1985)).  Put differently, ratification is "the equivalent of authorization, but it occurs after the fact, when a principal gains knowledge of an unauthorized transaction but then retains the benefits or otherwise takes a position inconsistent with nonaffirmation."  *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 310 (1st Dist. 1992) (citing *Hofner v. Glenn Ingram & Co.*, 140 Ill. App. 3d 874, 992 (1st Dist. 1985)).        Generally, the question of ratification turns on the principal's intent to affirm.  *Progress Printing Corp.*, 235 Ill. App. 3d at 310.  Like authority, ratification need not be express; it may be inferred from surrounding circumstances, "including long-term acquiescence, after notice, to the benefits of an unauthorized transaction."  *Id.*; see

also *Athanas v. City of Lake Forest*, 276 Ill. App. 3d 48, 693 (2nd Dist. 1995) ("A principal, * * * can ratify the actions of its agent by not repudiating the agent's actions once it has knowledge of the actions, or by accepting the benefits of the actions."). Of significance in this case, "although normally a principal's actual knowledge of the transaction is essential, one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." *Progress Printing Corp.*, 235 Ill. App. 3d at 310 (citation and internal quotation marks omitted). Although the principal may act on a presumption that a third party will not be negligent in failing to ascertain the extent of an agent's authority, see *Sphere Drake Insurance Ltd. v. American General Life Insurance Co.*, 376 F.3d 664, 673-74 (7th Cir. 2004), it is the principal's duty to monitor its agents to make sure they are not exceeding their authority, see *Progress Printing Corp.*, 235 Ill. App. 3d at 369 ("[A] third party's duty in this regard [to verify an agent's authorization] does not obviate a principal's own duty to third parties, which is to exercise reasonable diligence in monitoring its agents' activities so that they are not exceeding their authority.").

Perhaps most important at this stage of the litigation, the existence and scope of an agency relationship are questions of fact unless the relationship is so clear as to be undisputed. See, *e.g.*, *McNamee v. Sandore*, 373 Ill. App. 3d 636, 651 (2nd Dist. 2007) ("While agency is a legal concept, the existence and scope of an agency relationship is a fact-intensive inquiry reserved for the finder of fact unless the parties' relationship is so clear as to be undisputed."). As stated at the outset, Plaintiff need only make out a *prima facie* case to establish personal jurisdiction. Here, the parties have submitted affidavits and other record evidence, as is proper on a Rule 12(b)(2) motion. All factual disputes supported by Plaintiff's evidence must be resolved in Plaintiff's favor, as must those disputes for which Defendants do not offer

evidentiary support.  With these rules in mind, the Court addresses the two motions to dismiss for lack of personal jurisdiction.

### C.      Defendant Eirles

#### 1.      *Evidence of Agency*

Eirles' primary argument that this Court lacks personal jurisdiction over it is that, even assuming Deutsche Bank and Capital were Eirles' agents in carrying out the Series 42 Notes transaction, "those actions were directly contrary to the express instructions of Eirles that the Notes could not be sold in the United States and were made without Eirles' knowledge."  Eirles 12(b)(2) Mem. at 8.  To be clear, Eirles expressly concedes for the purposes of its Rule 12(b)(2) motion that ABN has adequately alleged Deutsche Bank was Eirles' agent (and apparently that Deutsche Bank was authorized to appoint Capital as its subagent).  *Id.* at 8 n.3.  Eirles argues merely that those putative agents were acting outside the scope of their authority when they sold the Series 42 Notes to ABN, a U.S. entity.  As discussed below, however, ABN has put forth enough evidence to support its *prima facie* case of an agency relationship.  Factual disputes such as whether those agents were acting in the scope of their authority must be resolved in Plaintiff's favor at this stage of the litigation.  Plaintiff has sufficiently supported its allegations with evidence to refute Eirles' evidence that the putative agents were acting outside the scope.

ABN alleges that Eirles and Deutsche Bank entered into a series of global agreements relating to the Series 42 Notes transaction, under which Deutsche Bank was to procure purchasers of the Notes, arrange for the distribution of the Notes, and provide information about the Notes to actual and prospective purchasers.  Deutsche Bank hired Sarco to help find

purchasers for the Notes.[2]  In the months leading up to the July 15, 2003 closing of the Notes transaction, Sarco allegedly employed a number of sales agents in the United States to help it procure purchasers and set up a distribution chain for the Notes.  These agents included Dan Coddington, Hans Karundeng, and Sam Recile.  See, *e.g.*, Pl. Ex. 42 (an email from Hajela requesting quick payment of his fee from Deutsche Bank so he can pay his salespeople); Pl. Ex. 12 (stating that Hajela and the sales agents would split the fee Hajela made on the deal); Pl. Ex. 5 at 23-25 (Hajela stating that Recile had no association with Sarco but that he had introduced Hajela to Karundeng); Pl. Ex. 5 at 114-15 (Karundeng and Recile are associated with Hopewell); Pl. Ex. 48 (email from Capital's Anthony Long to Hopewell's president, Franklin Ogele, confirming sale, and forwarded to Recile).  Sarco also located Hopewell as a potential purchaser and provided Hopewell with an indicative term sheet for the notes.  Throughout this process, "Sarco was directing Hopewell in its role as purchaser, which Hajela has admitted was under his 'control' and at his 'disposal.'" Pl. Opp. to Eirles Mot. at 5.  Soon after Sarco brought in Hopewell as a purchaser, Sarco secured Capital as an intermediary and as Deutsche Bank's counterparty.  Capital and Sarco approached ABN and insisted that ABN act as a principal in the Notes transaction, guaranteeing Hopewell's purchase.  Hopewell was an ABN client, and, initially, ABN had agreed only to act as a clearing agent for Hopewell.

The ultimate chain of distribution was meant to be from Eirles to Deutsche Bank to Capital to ABN to Hopewell.  ABN alleges that Deutsche Bank, Eirles' agent, was fully aware

---

[2]  ABN alleges that Eirles authorized Deutsche Bank to hire Sarco, but the record evidence does not clearly support this allegation.  However, as stated above, Eirles appears to concede, at least for purposes of this motion, that the other Defendants were its agents and argues only that they acted outside the scope of their agency.  See Eirles 12(b)(2) Mem. at 8.

that Sarco and Capital were soliciting U.S. entities to enter into the deal, and that Deutsche Bank was aware of ABN's participation sometime before the closing. ABN cites numerous emails and phone calls supporting this assertion, most of which are between Deutsche Bank's Paul Levy and either Sarco's Mr. Hajela or Capital's Mr. Long. These communications tend to indicate, collectively, that Mr. Levy knew Sarco and Capital were soliciting U.S. purchasers for the Notes and, in fact, that he (and Deutsche Bank) condoned such solicitation. See, *e.g.*, Pl. Ex. 42 (July 21, 2003 email from Hajela to Levy regarding payment of Hajela's fee following the closing, and stating, "Any further delays would not further good will with the sales people I have to pay * * *"); Pl. Ex. 118 at 2-3 (June 10, 2003 phone call from Long to Levy with Long stating, "what I haven't * * * received * * * is the list of all five signatures that I want * * * from the States * * * * So, um, I'm going to have to wait to speak to Dan when he gets here * * * *"); Pl. Ex. 122 at 5 (June 19, 2003 phone call between Capital's Robert Floate and Levy with Levy asking "Do you have what you need from Dan's U.S. guy?"); Pl. Ex. 122 at 2 (Floate saying "I've had from the States overnight the relevant – most of the relevant documentation as you sent out last night signed off."). Moreover, Plaintiff presents sufficient evidence to support a *prima facie* case that Capital was acting directly as Deutsche Bank's agent, as well as acting as Sarco's agent.[3] For example, in its Answer, Capital admits that Deutsche Bank, "directly and through Sarco, was actively involved in and maintained ultimate control over the sale and distribution of the Series 42 Notes." Capital's Ans. ¶ 90. Capital further admits that it followed all of Deutsche Bank's directions and requirements (*Id.* ¶ 125), and that it had actual authority from Deutsche Bank to

---

[3] Sarco/Hajela argue that this sort of dual agency is not allowed as a matter of law, but an agent can have two principals, so long as there is disclosure and no conflict of interest. See *Corbett v. Devon Bank*, 12 Ill. App. 3d 559, 570-71 (1st Dist. 1973). Sarco does not argue that there was a conflict, and, in any event, at this stage of the litigation the Court must construe the facts in Plaintiff's favor.

distribute, arrange, and make representations about the Series 42 Notes (*Id.* ¶ 134). Capital's

Mr. Long testified at his deposition that Deutsche Bank controlled the terms of the Notes and

Deutsche Bank and Sarco had control over the form and structure of the referenced portfolio and

the credit default swap underlying the Notes. Pl. Ex. 4 at 77. He also testified that, as long as

Capital complied with Deutsche Bank's procedures, Long believed Capital was authorized by

Deutsche Bank to act as its distribution agent. Pl. Ex. 4 at 103. Mr. Long testified, "We were

acting at the direction of Deutsche Bank and Sarco." Pl. Ex. 4 at 76. Plaintiff also points to a

number of phone calls between Mr. Long and Mr. Levy that support the notion that Capital was

working as Deutsche Bank's agent. Pl. Ex. 107 at 3; Pl. Ex. 116 at 8-10 (Long and Levy

discussing lining up people for the trade and getting "the right bit of paper" circulating among

the parties); Pl. Ex. 125 at 3-5 (Long and Levy discussing a problem with one of the clients

arranged by Dan Hajela); Pl. Ex. 126 at 3 (Long saying to Levy "We are ready to follow your

instructions really"); Pl. Ex. 127 at 2-5 (discussing changes Levy is making to term sheets for a

particular trade).

Perhaps most compelling, Eirles expressly admits that it exercised no oversight over

Deutsche Bank in how Deutsche Bank carried out its duties procuring purchasers and selling the

Notes. See Pl. Ex. 1 at 176-77 (Eirles' Director Mr. Whelan explaining that Eirles does not

supervise Deutsche Bank and leaves compliance requirements to Deutsche Bank); Pl. Ex. 1 at

180 ("[D]oes Eirles have any checks in place to ensure that its selling restrictions are adhered to?

A. No, we don't . . . the notes are all sold to Deutsche Bank so the question of selling restrictions

just typically does not arise."); Pl. Ex. 1 at 181 (Eirles had no procedures in place to police its

selling restrictions because "we don't feel that the selling restrictions are applicable after that

original sale."); Pl. Ex. 1 at 183 (Mr. Whelan stating that he believes the selling restrictions still

apply after the sale to Deutsche Bank but that he does not think it is Eirles' duty to monitor

them); Pl. Ex. 1 at 197 ("Q. What procedures does Eirles have in place, if any, to ensure that

Deutsche Bank complies with this provision which indicates that it will not communicate

directly or indirectly with a United States person if that person is a purchaser or perspective [sic]

purchaser? A. Eirles does not have any procedures in place for that."); Pl. Ex. 1 at 218 (Q. What

procedures does Eirles have to ensure the "arranger will comply with all relevant laws,

regulations, and directives" in each jurisdiction where it "purchases, offers, sells, or delivers the

notes?" A. "None, apart from having legal opinions from outside counsel.").  This evidence

supports Plaintiff's argument that, even if Deutsche Bank was acting outside the scope, Eirles

ratified Deutsche Bank's conduct by failing to monitor its activities.  See *Progress Printing*

*Corp.*, 601 N.E.2d at 1066-67 ("[A] third party's duty in this regard [to verify an agent's

authorization] does not obviate a principal's own duty to third parties, which is to exercise

reasonable diligence in monitoring its agents' activities so that they are not exceeding their

authority.").  Moreover, it is undisputed that Eirles went forward with the transaction, closed the

deal, and then paid interest on the Notes to ABN for months afterwards.  Pl. Ex. 95 ¶¶ 4-5

(declaration of David Boemo, an executive director in ABN's finance department, that Eirles

paid ABN five quarterly interest payments on the Notes totaling almost $7.8 million and that

Eirles never provided notice of an intent to redeem the Notes).  This, too, supports Plaintiff's

ratification argument.  See *Progress Printing Corp.*, 601 N.E.2d at 1067 (Ratification is "the

equivalent of authorization, but it occurs after the fact, when a principal gains knowledge of an

unauthorized transaction but then retains the benefits or otherwise takes a position inconsistent

with nonaffirmation.").  Eirles argues that after the transaction closed it was no longer

responsible for the sale or for monitoring the sales restrictions, but that assertion simply raises yet another question of fact. It does not undercut Plaintiff's *prima facie* case of agency.

Again, Eirles' chief argument against Plaintiff's *prima facie* case of agency is that it expressly prohibited Deutsche Bank from selling the Series 42 Notes in the United States, and that therefore, Deutsche Bank and the other putative agents were acting outside the scope of their authority when they sold the Notes to ABN. In support of that argument, Eirles cites to three documents that include the U.S. sales restriction: the Structured Investment Terms Module 9.1.1.2 (Purchase of Notes), the Supplemental Programme Memorandum for the Series 42 Notes, and the Purchase Agreement between Deutsche Bank and Capital. The Structured Investment Terms Module states that "[t]he Notes may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except to the extent permitted by the applicable Supplemental Programme Memorandum." Eirles App. Ex. D. The Supplemental Programme Memorandum states that "[t]he Notes may not be offered, sold, resold, delivered or transferred within the United States or to, or for the account or benefit of, U.S. persons (as such term is defined in Regulation S under the Securities Act)." FAC, Ex. 11 at 47. The Purchase Agreement between Deutsche Bank and Capital provided that Capital was not allowed to sell or distribute the Notes to any U.S. Person and required any purchaser from Capital to agree that it would not sell to any U.S. Person either. See Eirles App. Ex. B. Eirles argues that, based on these documents, the sale to ABN constituted an act outside the scope of any authority Deutsche Bank and its subagent might have had.

There are problems with Eirles' argument, at least at this stage of the litigation. First, the Supplemental Programme Memorandum did not exist until after the Series 42 Notes transaction closed. Second, none of the other documentation cited expressly prohibited sales to U.S.

persons.  Plaintiff argues with respect to the substantive securities fraud claims that it reasonably believed the transaction was exempt under Regulation S, which, although restrictive, is less restrictive than the absolute restriction on U.S. sales included in the Supplemental Programme Memorandum.  In some circumstances, Regulation S allows sales to or through U.S. persons.

ABN argues that, other than the Supplemental Programme Memorandum, all of the documentation cited by Defendants was consistent with a Regulation S transaction, and for that reason ABN was not on notice of the absolute restriction when it decided to enter the transaction. That argument, when applied to the agency question, creates at least a fact issue about whether the downstream agents (Capital in particular) were aware of the restriction and therefore acting outside the scope of their authority when they sold to ABN.  If ABN was not on notice of the absolute restriction, potentially other parties to the transaction were not aware of it either.  More to the point, ABN argues that the absolute restriction was added to the terms of the Notes to maximize Eirles/Deutsche Bank's profits and minimize their regulatory obligations, but that Eirles/Deutsche Bank always intended to set up a "sham" transaction that would have the appearance of an offshore deal but would actually consummate in a sale to U.S. persons.  See FAC ¶ 9.  Given those allegations, the fact of the absolute restriction's inclusion in one document, which was not issued until after closing, does little to support Eirles/Deutsche Bank's theory that the putative agents were acting outside the scope of their authority.  On the contrary, it tends to support Plaintiff's theory that the agents were doing exactly what they were told to do. In any event, at this stage all factual disputes must be resolved in ABN's favor.  The Court finds that Plaintiff's allegations support its *prima facie* case, and that any allegations that the putative agents were acting outside the scope must await later stages of the litigation.

Finally, Eirles argues that ABN may not base personal jurisdiction on apparent authority. That is incorrect as a matter of law. See *New Process Steel, L.P. v. PH Group Inc.*, 2002 WL 31253886, at *2 (N.D. Ill. Oct. 8, 2002); *Avesta Sheffield, Inc. v. Olympic Continental Resources*, 2000 WL 198462, at *4 (N.D. Ill. Feb. 14, 2000) ("Establishing personal jurisdiction over a defendant through an agent is also consistent with the due process clause * * * * An agent's authority can be actual *or apparent*, with circumstantial evidence used to establish the existence and extent of the authority.") (citations omitted; emphasis added). Moreover, as discussed above, Eirles concedes for the purposes of its motion that Deutsche Bank (and ostensibly the other subagents) were acting as Eirles' agents. Therefore, ABN's argument is based on actual authority, not apparent authority.

In sum, because ABN has presented evidence that Deutsche Bank, Sarco, and Capital all were acting as agents or subagents of Eirles; because there are factual disputes over whether the agents and subagents were acting in the scope of their authority; and because there is undisputed evidence that Eirles did not oversee Deutsche Bank's activities with respect to the Series 42 Notes transaction, strongly suggesting that Eirles ratified the agents' actions in any event, the Court finds that Plaintiff has met its burden of showing a *prima facie* case of agency.

### 2. Contacts with Illinois and Fairness

The next question is whether Eirles' agents' contacts with the United States generally and with Illinois in particular are sufficient to exercise personal jurisdiction over Eirles in this case. The Court finds that they are. In particular, Plaintiff alleges that Capital, Sarco, and Hopewell, all acting on behalf of Deutsche Bank (and derivatively of Eirles), sought out ABN to solicit it to enter the deal. Plaintiff presents evidence that, between April and July 2003, Capital engaged in more than twenty-five phone calls with ABN in Chicago or Hopewell in New Jersey, and

between ten and twenty e-mails with ABN or Hopewell.  See, *e.g.*, Pl. Ex. 4 at 32 (Long

Deposition stating there were "[b]etween one and two dozen" phone calls with ABN, all in

Chicago); *id.* at 33 ("The majority" of those calls were initiated by Capital.); *id.* at 34, 148.

Plaintiff also presented evidence that Sarco communicated terms of the Notes to ABN,

reviewed the Notes documentation, instructed Capital and Hopewell as to what Deutsche Bank

required, and acted as a conduit of information between Deutsche Bank, Capital, ABN,

Hopewell, and the purported end purchasers.  ABN signed a purchase agreement with Capital,

and Capital has admitted that it insisted on having ABN participate in the deal.  The mere

existence of a contract with an out-of-state party does not automatically establish personal

jurisdiction over that party, *Burger King*, 471 U.S. at 478, but "[t]he requisite contacts * * * may

be supplied by the terms of the agreement, the place and character of prior negotiations,

contemplated future consequences, or the course of dealings by the parties."  *Mellon Bank (East)*

*PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (citing *Burger King*, 471 U.S. at

479).  Where an agent *seeks out* contacts with the forum resident, initiates negotiations, and

actively pursues them with the knowledge that they are in the United States, that can be enough

to establish personal jurisdiction.  *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 974 F. Supp. 468, 474

(E.D. Pa. 1997).

Here, there is more than just a contract between the parties, and more than just actively

pursued negotiations.  Plaintiff alleges intentional torts.  That makes the personal jurisdiction

inquiry somewhat simpler.  The Seventh Circuit has repeatedly held that tortfeasors must expect

to be haled into Illinois courts for torts where the injury took place there.  See *Janmark, Inc. v.*

*Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) ("[T]he state in which the injury (and therefore the

tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train

outside its borders."); *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Limited Partnership*, 34 F.3d 410, 411–12 (7th Cir. 1994). Here, not only did the injury allegedly occur in Illinois, Plaintiff alleges that Capital, Sarco, and Sarco's sales agents sought out ABN to solicit it to enter the deal. Those actions constitute sufficient contacts with Illinois to warrant exercising personal jurisdiction over them in a case based on those contacts.[4] The sales agents "purposefully directed [their] business efforts toward the other state," and therefore "the actual physical presence of the defendant in that state is not necessary." *Burger King*, 471 U.S. at 476. The alleged agents have sufficient minimum contacts with Illinois, and as discussed above these contacts may be imputed to Eirles for the purpose of establishing personal jurisdiction.

Finally, the Court finds that compelling Defendants to litigate in Illinois does not offend "traditional notions of fair play and substantial justice." *Asahi*, 480 U.S. at 113; see also *International Shoe Co.*, 326 U.S. at 316. In this regard, assertion of jurisdiction must be reasonable in light of the burden it would place on the defendant, the plaintiff's interest in

---

[4] Because the Court finds that it has personal jurisdiction over Eirles based on the minimum contacts of its agents with Illinois, the Court need not separately address whether Plaintiff has established personal jurisdiction over Eirles based on the "stream of commerce" test or the "effects" test. The Court notes, however, that it likely would find that it had jurisdiction under these other theories, which were developed to reach more remote actors than are alleged here. See *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 550 (7th Cir. 2004) ("If a defendant delivers products into a stream of commerce, originating outside the forum state, with the awareness or expectation that some of the products will be purchased in the forum state, that defendant may be subject to specific jurisdiction in the forum state.") (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980)); see also *Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (If a commercial defendant's efforts are directed toward a particular jurisdiction, the fact that the actor did not actually enter the jurisdiction is not of crucial importance.). Here, by contrast, alleged agents of Eirles specifically sought out ABN to solicit it to act as a principal in the Notes transaction. That is likely more than enough to satisfy these other methods of establishing personal jurisdiction. However, and again this is not necessary for the Court's decision, the Court agrees with Eirles that Plaintiff likely could not have established personal jurisdiction based only on an alter ego theory. See *Home-Stake Production Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1021 (10th Cir. 1990) ("The dominated corporation does not direct and control its dominating corporate or individual alter ego. Accordingly, it is unfair to impute to the dominated corporation the forum contacts of its alter ego.").

obtaining relief, the interests of Illinois, the judicial system's interest in efficient resolution of controversies, and the "shared interest of the several States in furthering fundamental substantive social policies." *Asahi*, 480 U.S. at 113. Plaintiff alleges federal securities fraud and damages of $44 million. Securities fraud is an intentional tort. Defendants knew their actions targeted an Illinois resident. Moreover, Defendants are sophisticated securities broker-dealers, a global investment bank, and a special purpose entity created by that bank. Exercising personal jurisdiction over them will not be an unfair burden. In this regard, it bears emphasizing that Eirles is a special purpose entity created by Deutsche Bank, which is not challenging personal jurisdiction. Plaintiff alleges, and Eirles does not deny, that Eirles is a shell company that does not meaningfully exist apart from Deutsche Bank. See Pl.'s Opp. at 11-12. In light of all the facts currently before the Court for purposes of this motion, the Court finds it reasonable to compel Eirles to litigate in Illinois.

> **D.       Defendants Sarco/Hajela**

Sarco/Hajela concede that the Court has personal jurisdiction over them with respect to the federal claims, but argue that if the federal claims are dismissed, the pendent state claims should be dismissed as well for, *inter alia*, lack of personal jurisdiction. The Court disagrees. ABN has put forth sufficient evidence to state a *prima facie* case based on Mr. Hajela's own contacts with Illinois. See Pl.'s Opp. to Sarco/Hajela Mot. at 9 (bullet list of recorded telephone calls and emails wherein Mr. Hajela references communications with ABN AMRO in Chicago). Sarco/Hajela have challenged Plaintiff's evidence with evidence that Mr. Hajela did not actually speak to people at ABN AMRO, even though that is what he said he did in the aforementioned

phone calls and e-mails.[5]  Rather, in a second declaration filed with Sarco/Hajela's reply brief,

Mr. Hajela stated that in those phone calls and e-mails he was using a shorthand method of

communication to simplify things.  Instead of explicitly saying he was going to talk to Mr.

Recile, who was going to talk to someone at Hopewell, who was going to talk to someone at

ABN AMRO, Mr. Hajela often simply stated that he was going to talk to someone at ABN

AMRO.  At this stage of the litigation, this factual dispute must be resolved in Plaintiff's favor.

That being the case, the Court finds that Plaintiff has submitted enough evidence that

Sarco/Hajela communicated directly with ABN to establish its *prima facie* case.

Moreover, and as discussed more fully above, Plaintiff has put forth sufficient evidence

that Capital was Sarco's agent in soliciting ABN to act as a principal in the Notes transaction.

Sarco/Hajela do not deny that Mr. Hajela discussed the transaction with Capital's Mr. Long at

length, and that Mr. Hajela worked with Mr. Long and others to put the transaction together.  On

the contrary, Sarco simply argues that "(1) the Sarco Defendants did not control the alleged

agents; and (2) the alleged agents acted on their own behalf, not Sarco's."  Sarco Reply at 10.  In

other words, Sarco/Hajela argue that the "alleged agents" were not agents at all.  Sarco/Hajela

argue that "[s]everal documents" show that Mr. Hajela did not control Capital, but Defendants

offer only two concrete examples.  First is an e-mail in which Mr. Hajela asked Capital to "[l]et

me know if any of the above causes a problem for you."  Sarco Reply at 11 (citing Pl.'s Ex. 4-2).

Under Defendants' rationale, "[i]f CIL had been under Sarco's control, CIL's views would have

been irrelevant."  Sarco Reply at 11.  The Court disagrees.  It's equally possible Mr. Hajela was

---

[5]  In light of new evidence presented in Sarco/Hajela's reply brief, see DE 202, the Court allowed
Plaintiff to file a brief surreply to Sarco/Hajela's Rule 12(b)(2) motion, see DE 207-2, and,
concomitantly, allowed Sarco/Hajela to file an even briefer sur-surreply, see DE 219.

just being polite. Second, Sarco/Hajela cite to a phone call between Mr. Long and Mr. Hajela in

which, according to Sarco/Hajela, "Mr. Long of CIL instructed Mr. Hajela that, among other

things, he wanted AAI to take the principal risk of guaranteeing Hopewell via a letter." *Id.*

(citing Pl.'s Ex. 109). Sarco/Hajela do not cite to a particular page number, though it appears

that the letter referred to may be mentioned on page 12 of the cited transcript. Still, a review of

the entire phone call suggests that Mr. Long is working for Mr. Hajela (and that both of them are

working for Deutsche Bank) as much as or more than it suggests that Mr. Hajela is working for

Mr. Long. More important, and as discussed above, agency is a question of fact. Any factual

dispute raised by Sarco/Hajela must be resolved in Plaintiff's favor at this stage of the litigation.

Therefore, the Court finds Plaintiff has adequately pleaded that Capital was working as Sarco's

agent.

Sarco/Hajela offer similar responses to Plaintiff's agency allegations with respect to Mr.

Recile and the other alleged sales agents – that the Sarco Defendants did not control them and

that, even if they did, Plaintiff has presented no evidence that the alleged agents had the right to

bind Sarco. Because the Court finds that Plaintiff has put forth sufficient evidence that Capital

was Sarco's agent, it need not reach the issue of whether Plaintiff has made out a *prima facie*

case that Recile, Coddington, and Karundeng were also acting as Sarco's agents. However, the

Court notes that Sarco's argument is not supported by the case law – the cases support the

proposition that evidence of control is enough to make out a *prima facie* case of agency,

regardless of whether there is also evidence that the putative agent had the right to bind the

principal. See, *e.g.*, *Brown v. Sears Roebuck & Co.*, 2002 WL 31433395, at *2-3 (N.D. Ill. Oct.

29, 2002) (explaining that allegations of control, or "subservancy" are sufficient to state a *prima*

*facie* case of agency). Furthermore, Sarco/Hajela has not put forth evidence affirmatively

suggesting that Recile, Coddington, and Karundeng were *not* Sarco's agents. Sarco points out

that ABN presented no agreements between Sarco and the alleged sales agents, that the agents stood to benefit personally from their involvement in the transaction, and that Sarco itself was not a purchaser or seller of the Notes. None of these facts contradict Plaintiff's agency argument. For this independent reason, the Court finds that Plaintiff has adequately pleaded that Recile, Coddington, and Karundeng were acting as Sarco's agents in soliciting ABN AMRO to enter the Series 42 Notes Transaction.

In sum, the Court finds that Plaintiff has adequately alleged that Sarco has sufficient minimum contacts with Illinois to exercise personal jurisdiction over him. Plaintiff has alleged and presented evidence that Sarco directly contacted ABN AMRO for the purpose of soliciting its participation in the Series 42 Notes transaction. Plaintiff has also alleged and submitted evidence that Capital, Recile, Coddington, and Karundeng were acting as Sarco's agents in soliciting ABN AMRO. As discussed more fully above in the section relating to Eirles, these agents' contacts with Illinois are also sufficient such that haling them into Illinois courts on claims based on those contacts comport with Due Process. The Court therefore finds that Plaintiff has established a *prima facie* case of personal jurisdiction over Sarco/Hajela, with respect to both the federal and state claims.[6]

### III.  Rule 12(b)(6) Motions to Dismiss for Failure to State a Claim

#### A.  Legal Standard

In evaluating the motions to dismiss, the Court accepts all of Plaintiff's well-pleaded allegations in the Complaint as true and draws all reasonable inferences in Plaintiff's favor. *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000). The Court need

---

[6] Nothing in Sarco/Hajela's Memorandum in Further Support of its Rule 12(b)(2) motion is to the contrary. See DE 219. The Memorandum chiefly attacks Plaintiff's version of the facts (*i.e.*, that Recile, Karundeng, and Coddington were Sarco's clients, not its agents). As stated throughout this opinion, factual disputes are resolved in Plaintiff's favor.

"'not strain to find inferences favorable to the plaintiffs' which are not apparent on the face of the complaint," however. *In re Allscripts, Inc. Secs. Litig.*, 2001 WL 743411, at *4 (N.D. Ill. June 29, 2001) (quoting *Coates v. Ill. State Bd. of Ed.*, 559 F.2d 445, 447 (7th Cir. 1977)). Plaintiff's non-fraud claims will survive a motion to dismiss for failure to state a claim so long as the Complaint sets forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007). As discussed below, however, the state and common law fraud claims must meet the heightened pleading requirements of Rule 9(b), and the federal securities fraud claims must meet the even higher pleading requirements of the Private Securities Litigation Reform Act.

**B.     Count I – Failure to Register**

In Count I, ABN AMRO alleges violations of Sections 5(a), 5(c), and 12(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 77*l*(a)(1) against Eirles and Capital for failure to file a registration statement regarding the Series 42 Notes. Eirles moves to dismiss these claims, arguing that (1) the Notes transaction was a private placement exempt from the Securities Act's registration requirement, and (2) Eirles is not a statutory "seller" and therefore is not covered by the registration provisions of the Act. As discussed below, the Court finds that Plaintiff has adequately pleaded its registration claim. Therefore, the Court respectfully denies Eirles' motion to dismiss Count I.

*1.      "Seller" under Section 12(a)(1)*

Section 5(a) of the Securities Act makes it unlawful to sell or deliver unregistered securities in interstate commerce. 15 U.S.C. § 77e(a). Section 5(c) of the Act requires the filing of a registration statement in order to offer or sell securities in interstate commerce. 15 U.S.C. § 77e(c). Section 12(a)(1) of the Act provides that "[a]ny person who offers or sells a security in violation of section 77e of this title * * * shall be liable * * * to the person purchasing such

security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  15 U.S.C. § 77*l*(a)(1).

The Supreme Court has held that statutory sellers under § 12(a)(1) include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain.  See *Pinter v. Dahl*, 486 U.S. 622, 644 n.22, 647 (1988); accord, *e.g.*, *Steed Finance LDC v. Momura Securities Int'l*, 2001 WL 1111508, at \*7 (S.D.N.Y. Sept. 20, 2001).  Generally speaking, issuers such as Eirles are *not* statutory sellers, because they do not pass title immediately to the plaintiff purchaser.  See, *e.g.*, *Pinter*, 486 U.S. at 644 n.21 ("One important consequence of [the purchaser clause] is that § 12(1) imposes liability only on the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers.  Thus, a buyer cannot recover against his seller's seller."); *Lone Star Ladies Investment Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001) ("[I]n a firm commitment underwriting, such as this one, the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers.  Rather the public purchases from the underwriters, and suing the issuers is an attempt to 'recover against [the] seller's seller.'") (quoting *Pinter*, 486 U.S. at 644 n.21).  That said, as explained by the Fifth Circuit in *Lone Star Ladies*, "*Pinter* holds that a plaintiff invoking section 12 may show that an issuer's role was not the usual one; that it went farther and became a vendor's agent." 238 F.3d at 370.  In other words, so long as a plaintiff adequately pleads that an issuer was either its direct seller *or* that it actively solicited the sale, it will survive a motion to dismiss.  See *id.*

In this case, Plaintiff has done just that.  It has pleaded that Eirles and Capital "directly or indirectly" used interstate commerce "to sell and offer to sell the Series 42 Notes."  FAC ¶ 226.

It also has pleaded that, on information and belief, through its agents, Eirles participated in the preparation of the Supplemental Programme Memorandum and/or the Indicative Note Term Sheet, and that as a result of its participation in preparing these documents, "Eirles actively solicited the purchase of the Series 42 Notes." *Id.* ¶ 230. Plaintiff essentially alleges that Eirles employed agents to actively solicit ABN and to sell to ABN. See *id.* ¶¶ 226, 230. Those allegations are sufficient to survive a motion to dismiss. See *In re Enron Corp. Securities, Derivative & Erisa Litigation*, 2004 WL 405886, at *27 n.51 (S.D. Tex. 2004) ("[L]iability under § 12(2) is ordinarily restricted to the immediate seller of the defrauded purchaser. If none of the exceptions to this § 12(2) privity requirement are applicable, i.e., control, agency, aiding and abetting or conspiracy, each plaintiff member would have a cause of action only against his or her immediate seller * * * *"); *Endo v. Albertine*, 147 F.R.D. 164, 173 (N.D. Ill. 1993) (explaining that courts will certify a class of defendants on a Section 12 claim where "an important legal relationship uniting the defendant underwriters and justifying class treatment' is shown to exist" and that "[p]artnership [and] joint enterprise * * * may serve as such a link, since they denote some form of activity or association on the part of the defendants that warrants imposition of joint liability against the group even though the plaintiff may have dealt primarily with a single member.") (quoting *Akerman v. Oryx Communications, Inc.*, 609 F. Supp. 363, 375 (S.D.N.Y. 1984)).

Of course, Plaintiff will bear the burden of demonstrating that Eirles did solicit in a manner sufficient to satisfy *Pinter* if it hopes to prevail on the Section 12 claim. See *Lone Star Ladies*, 238 F.3d at 370. The Court finds only that Plaintiff's Section 12 claim cannot be resolved on a Rule 12(b)(6) motion, although the parties may bring the question again upon a properly developed record under Rule 56.

## 2. *Exempt Private Placement*

Section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2), exempts from registration with the Securities and Exchange Commission "transactions by an issuer not involving any public offering." *Id.* Although not defined in the Act, a "non-public offering" is "[a]n offering to those who are shown to be able to fend for themselves * * * * The focus of inquiry should be on the need of the offerees for the protections afforded by registration." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125, 127 (1953). Following *Ralston Purina*, courts have relied on four factors in determining whether an offering is a private placement: (1) the number of offerees and their relationship to the issuer; (2) the number of units offered; (3) the size of the offering; and (4) the manner of the offering. See *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 900 (5th Cir. 1977); accord *Cogniplex, Inc. v. Ross*, 2001 WL 436210, at *11 (N.D. Ill. April 27, 2001).

Eirles focuses on these factors – and, in particular, the sophistication and bargaining power of ABN – in arguing that the Notes transaction was exempt. This may well be proved. However, the burden of proof is on the party claiming the benefit of the exemption – in this case, Eirles. See *Mark v. FSC Securities Corp.*, 870 F.2d 331, 333 (6th Cir. 1989). In other words, exemption is an affirmative defense. *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 899 (5th Cir. 1977) (citing *Ralston Purina Co.*, 346 U.S. at 126). Plaintiff need not anticipate affirmative defenses in its complaint, and ordinarily the validity of an affirmative defense cannot be resolved under Rule 12(b)(6). See, *e.g.*, *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court – that is, admits all the ingredients of an impenetrable defense – may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).") (collecting cases); accord, *e.g.*, *Walker v. Thompson*, 288 F.3d 1005, 1010 (7th Cir. 2002) (discussing statute of limitations issues); *Lone Star Ladies*, 238 F.3d

at 369 (explaining that Rule 8's lower pleading standards apply to Section 12 claims on a motion to dismiss and that this "lower threshold of liability under section 11 and 12 of the 1933 Act as compared to the 1934 Act here [on a Rule 12(b)(6) motion] matters a great deal").

In this case, Plaintiff has adequately pleaded that the securities sold were not registered and that interstate transportation or communication in the mails was used in connection with the sale or offer of sale. Those allegations are all that is required to establish a *prima facie* violation of Section 5 of the 1933 Act, 15 U.S.C. § 77e, for failure to register. See *Johnston v. Bumba*, 764 F. Supp. 1263, 1271 (N.D. Ill. 1991). See also *Cogniplex*, 2001 WL 436210, at *12 ("Because the public/private offering determination requires a careful analysis of all facts and surrounding circumstances, dismissal of Plaintiffs' claim is inappropriate at this time."). Likewise in this case, the Court finds it prudent to allow discovery to go forward so that the factual analysis warranted under the case law may be conducted. The burden rests with Eirles to show that the transaction falls within the private offering exemption. It may well be able to show that ABN AMRO did not need the protections of the securities laws in this instance. At this juncture, however, dismissing the claim would be premature; the requisite development and weighing of facts has yet to take place. Therefore, because Plaintiff has adequately alleged that Eirles was a seller within the meaning of Section 12(a)(1), and that Eirles sold unregistered securities, Eirles' motion to dismiss Count I must be denied.

## C. Count II – Securities Fraud

Count II, the federal securities fraud claim, is alleged against Capital, Deutsche Bank, Eirles, and Sarco. (Again, claims against Capital are not addressed in this opinion.) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") forbids the "use or employ, in connection with the purchase or sale of any security * * *, [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe

as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements § 10(b) by declaring it unlawful:

    (a)       To employ any device, scheme, or artifice to defraud,

    (b)       To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made * * * not misleading, or

    (c)       To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.  The Supreme Court has found an implied private right of action under Section 10(b), based on the statute's text and purpose, for purchasers or sellers of securities injured by its violation.  See, *e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005)).  Seventh Circuit precedent teaches that, to state a claim under § 10(b) of the Securities Exchange Act and Rule 10b-5, a plaintiff must allege that the defendant "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries."  *In re Healthcare Compare Corp. Securities Litig.*, 75 F.3d 276, 280 (7th Cir. 1996); accord *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), vacated on other grounds, 127 S. Ct. 2499 (June 21, 2007).  In addition, for cases premised on an omission, the plaintiff must allege a duty to disclose the omitted information.  See *Zurich Capital Markets v. Coglianese*, 332 F. Supp. 2d 1087, 1105 (N.D. Ill. 2004) (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).

       In 1995, Congress amended the Exchange Act by passing the Private Securities Litigation Reform Act ("PSLRA"), which prescribes heightened pleading standards for private securities fraud suits.  The Exchange Act, as amended by Section 21D of the PSLRA, provides, in pertinent part, that a securities fraud complaint must (1) "specify each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2). The PSLRA further provides that "the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u-4(b)(3)(A).

The PSLRA "essentially returns the class of cases it covers to a very specific version of fact pleading – one that exceeds even the particularity requirement of Rule 9(b)." *Tellabs*, 437 F.3d at 594. See, *e.g.*, *In re: Rockefeller Center Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (noting that the PSLRA "imposes another layer of factual particularity to allegations of securities fraud"). In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset that the defendants likely intended "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976); see also *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998).

The PSLRA, however, did not change the above-cited substantive scienter standard. See *Tellabs*, 127 S.Ct. 2504 (citing *Ernst & Ernst*, 425 U.S. at 194 & n.12). Moreover, although *Tellabs* did not address this issue,[7] under Seventh Circuit precedent, recklessness remains a

---

[7] With respect to recklessness, Justice Ginsburg stated in a footnote in the *Tellabs* opinion:

> We have previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n.12 (1976). Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required. The question whether and when recklessness satisfies the scienter requirement is not presented in this case.

127 S. Ct. at 2507 n.3 (citation omitted).

sufficient basis for the imposition of civil liability under Section 10(b) and SEC Rule 10b-5. See

*Makor Issues*, 437 F.3d at 600. Recklessness requires a showing of "'an extreme departure from

the standards of ordinary care, [ ] which presents a danger of misleading buyers or sellers that is

either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.*

(quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1997)). With

these principles in mind, the Court addresses the individual elements of the Plaintiff's Section

10(b) claim.[8]

### 1.     False Statement or Omission

As stated above, the PSLRA's heightened pleading instructions require the plaintiff to

"specify each statement alleged to have been misleading [and] the reason or reasons why the

statement is misleading," 15 U.S.C. § 78u-4(b)(1). Claiming that a particular statement was

untrue is not enough – plaintiffs must explain, with particularity, the factual basis for their

assertion that the statement was untrue. See *Premier Capital Management, L.L.C. v. Cohen*,

2003 WL 21960357, at *2 (N.D. Ill. Aug. 15, 2003) (citing *Clark v. TRO Learning, Inc.*, 1998

WL 292382, at *4 (N.D. Ill. May 20, 1998)). The relevant question is "whether the facts alleged

are sufficient to support a reasonable belief as to the misleading nature of the statement or

omission." *Tellabs*, 437 F.3d at 595 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir.

2000)).

As the basis of its 10b-5 claim, Plaintiff identifies the absolute restriction on sales within

the United States or to or on behalf of a U.S. person, which Plaintiff claims was omitted from all

---

[8]  The Court respectfully rejects Plaintiff's assertion that *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d
753, (7th Cir. 2007), limited the PSLRA's application to suits brought as plaintiffs class actions. The
parenthetical on which Plaintiff relies – "Although the PSLRA applies only to a 'suit that is brought as a
plaintiff class action', 15 U.S.C. § 78u-4(a)(1), the statute's rules apply whether or not the class is
certified." 495 F.3d 753, 756 (7th Cir. 2007) – clearly is limited to the context of securities fraud class
actions, and not meant to apply to the greater universe of private securities fraud claims.

of the documentation that Plaintiff received regarding the Series 42 Notes transaction. In particular, the first amended complaint alleges that Deutsche Bank failed to disclose the absolute restriction in the Indicative Note Term Sheet and other term sheets it prepared and which were received by ABN AMRO, or in the Bloomberg Notice[9] regarding the Notes. The first amended complaint further alleges that the principal letter agreement between Capital and ABN, and the four purchase agreements between Capital and Hopewell also omitted the absolute restriction. The Complaint specifically alleges that Eirles (either directly or through its agent, Deutsche Bank) and Deutsche Bank prepared the various documents provided to ABN and that these Defendants dictated the terms of the documents. See FAC ¶¶ 63, 74. It also alleges that Sarco substantially participated in the drafting of the documentation, (see FAC ¶¶ 87, 142-43), and that Capital was responsible for omitting the absolute restriction from the principal letter agreement it entered with ABN, see FAC ¶¶ 152, 159-60.

Defendants argue that there was no omission, but that even if there were an omission, it was immaterial as a matter of law. More specifically, Defendants submit that any omission was not material and that Plaintiff did not justifiably rely on it, because (i) the documentation Plaintiff received referenced other documents that *did* include the absolute restriction and (ii) ABN elected not to engage in due diligence that would have revealed the restriction, based on its belief that its role would be limited to that of a riskless principal.

---

[9] In its Memorandum in Further Support of its Rule 12(b)(2) motion, Sarco points out that the Bloomberg Notice included at Ex. 10 to Plaintiff's Complaint is dated "10-May-05," and argues that a notice dated two years after the Notes transaction took place cannot serve as the basis for Plaintiff's reliance. Sarco also argues that other Bloomberg notices referenced by AAI, but not attached to the Complaint, are illegible, see Pl.'s Ex. 53, or do not contain any reference to "sales restrictions," see Pl.'s Ex. 32. As a procedural matter (and as discussed in the opinion on the parties' motions to strike, see DE 161), the Court does not consider documents not attached to or incorporated by reference in the complaint. Furthermore, Sarco raises this argument for the first time in its sur-surreply to the motion to dismiss for lack of personal jurisdiction. It therefore would appear to be waived. Finally, even discounting the Bloomberg Notice, the Court finds that Plaintiff has sufficiently alleged an omission of material fact.

The Court finds that Plaintiff has adequately pleaded an omission and a duty to disclose. A review of the documents on which Plaintiff claims it relied reveals that the absolute restriction does not appear in any of them. At least one of the letter agreements between Capital and ABN contemplated transactions involving "exempted securities." See June 6, 2003, letter agreement from ABN to Capital; see also June 11, 2003, confirmation letter from Capital to ABN. The absolute restriction does not appear in these letters. Nor does it appear in the Indicative Note Term Sheet prepared by Deutsche Bank, the Series 42 Notes Term Sheets, also prepared by Deutsche Bank, or the four purchase agreements between Capital and Hopewell, which Plaintiff alleges Sarco was substantially responsible for drafting. The absolute restriction appears only in the Supplemental Programme Memorandum, which Plaintiff did not receive – indeed it did not exist – until after closing. See FAC ¶ 6.

Defendants urge the Court to focus on the Programme Memorandum, the Structured Investment Terms Module, and three other purchase agreements, between Deutsche Bank and Capital, Capital and Hopewell, and Hopewell and Sterling. Defendants argue that those documents refer to the Supplemental Programme Memorandum, and therefore could not be considered without also considering the Supplemental Programme Memorandum. But strictly speaking, those documents do not contain the absolute restriction either.[10] The Programme Memorandum states,

> [T]he Notes * * * may not be offered, sold, resold, delivered or transferred within
> the United States or to, or for the account or benefit of, U.S. persons (as such term
> is defined in Regulation S under the Securities Act) except in accordance with the

---

[10]  In an opinion dated March 16, 2007, the judge previously assigned to this case stated that he would consider the three purchase agreements because they are referenced in the first amended complaint. See DE 161. Moreover, the Programme Memorandum is included as an exhibit to the Complaint. See DE 86, Ex. 2. The Structured Investment Terms Module is attached to Eirles' motion to dismiss, but does not appear to be attached to the complaint. Plaintiff does not contest Defendants' reliance on this document, however, and in any event, the Court finds that the document makes no difference to the Court's consideration of the issues presented in this motion.

Securities Act or an exemption therefrom and under circumstances which will not require the Issuer to register under the Investment Company Act, as and to the extent specifically set forth in a Supplemental Programme Memorandum with respect to a particular series of Notes * * *

DE 86, Ex. 2. The Structured Investment Terms Module states,

The Purchaser understands that the Notes have not been and will not be registered under the Securities Act and that the Issuer has not and will not register under the Investment Company Act. The Notes may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except and to the extent permitted by the applicable Supplemental Programme Memorandum.

DE 165, Ex. D at 14. The three purchase agreements include a provision stating,

"you will not Distribute the Notes to any Third Party Purchaser (1) who is a "U.S. person" as that term is defined in Rule 902 of Regulation S promulgated under the U.S. Securities Act of 1933, * * * or (2) who is purchasing the Notes for the account of or for the benefit of a U.S. person."

DE 126, Ex. C. The Programme Memorandum and the three purchase agreements speak in terms of Regulation S, which restricts sales in the United States, but significantly does not *absolutely* restrict those sales. Those documents, when considered together with the documents on which Plaintiff relied, tend to support (or at least do not necessarily contradict) Plaintiff's allegation that Defendants presented the transaction as one governed by Regulation S – they present a transaction that was restrictive, but not one that was *absolutely* restricted.

Defendants argue that Plaintiff should not be allowed to claim that it thought the transaction was covered by Regulation S because Plaintiff does not make such a claim in the Complaint. But Plaintiff need not allege every conceivable fact to survive a motion to dismiss. Plaintiff need not allege that ABN was a distributor under Regulation S in order to assert claims that primarily revolve around Defendants' omissions and Defendants' subjective intent with respect to those omissions. In other words, the elements of a securities fraud claim do not include whether Plaintiff held a particular status with respect to Regulation S, or whether the transaction was properly structured under Regulation S, and therefore Plaintiff need not include

these facts in its Complaint.  Moreover, Plaintiff did allege in its Complaint that the Programme

Memorandum "contemplates reliance on Regulation S, in addition to the 100 Owner Exemption

and the Qualified Purchase Exemption."  FAC ¶ 42.  It also alleged that the agreement ABN

entered with Capital "confirmed that the Series 42 Notes were exempted securities."  DE ¶ 4; see

also *id.* ¶ 9.  Those allegations are sufficient.  The Court finds that Plaintiff has adequately

alleged an omission.  Next, the Court will discuss the materiality of that omission, and whether

Plaintiff was justified in relying on it.

2.     *Materiality*

An omitted fact is material "if there is a substantial likelihood that a reasonable

shareholder would consider it important in deciding how to vote."  *Basic v. Levinson*, 485 U.S.

224, 231 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))

(internal quotation marks omitted).  *TSC Industries* held, and *Basic* reaffirmed, that to satisfy the

materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly altered the 'total

mix' of information made available."  *TSC Industries*, 426 U.S. at 449; accord *Basic*, 485 U.S. at

231-32.  "[M]ateriality depends upon the facts.  It is necessary to examine 'the significance the

reasonable investor would place on the withheld or misrepresented information.'"  *Tellabs*, 437

F.3d at 596 (quoting *Basic*, 485 U.S. at 240) (There must be "'a substantial likelihood that a

reasonable purchaser or seller of a security (1) would consider the fact important in deciding

whether to buy or sell the security or (2) would have viewed the total mix of information made

available to be significantly altered by the disclosure of the fact.'")  (quoting *Longman v. Food

Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999)).  Materiality overlaps significantly with

justifiable reliance.  Indeed, Judge Wood explained in *Tellabs* that "[t]he crux of materiality is

whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact * * * *"  437 F.3d at 596.

Defendants' materiality arguments are almost indistinguishable from their reliance arguments (and overlap significantly with their omission argument).  Defendants argue that they disclosed the absolute restriction in several documents which ABN either received or elected not to obtain.  In other words, those documents (the Programme Memorandum in particular) were freely available to Plaintiff, and, had Plaintiff made efforts to obtain them, Plaintiff would have been alerted to the absolute restriction, or, at the very least, would have been referred to the Supplemental Programme Memorandum, which would have revealed the absolute restriction. The fact that Plaintiff chose not to obtain them, Defendants argue, shows that the omission was not material to Plaintiff because the documents that contained the omission were not material – they were not important enough for Plaintiff to ask for them.  Defendants further assert that even if the restriction on sale was not properly disclosed, its omission did not materially alter the total mix of information available because "[a]nyone reading the Programme Memorandum would understand that the Notes, which were bearer notes, were not suitable investments for U.S. persons."  Eirles Mem. at 26.

Plaintiff counters that the Programme Memorandum specifically contemplates the issuance of non-bearer notes, and that, in any event, "the tax implications of holding bearer notes was not an issue for ABN AMRO because it was not supposed to be the end-buyer."  Pl.'s Opp. at 23.  This argument potentially proves too much.  If the tax implications were not an issue because ABN was not supposed to be the end-buyer, then arguably the absolute restriction should not have been an issue either, for the same reason – ABN had a purchaser lined up, it meant to pass on the Notes immediately, and did not plan to bear any of the potential downsides of owning them, whether they be tax implications or sales restrictions.  But Plaintiff also argues

that, because materiality is a fact-based determination, resolution of this issue is inappropriate at the motion to dismiss stage. The Court agrees. It is true, as Defendants assert, that "[i]f the investor knows enough so that the lie or omission still leaves him cognizant of the risk, then there is no liability." *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985); see also *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) ("In determining whether Cozzi's reliance was justified, we must consider all of the facts that Cozzi knew, as well as those facts Cozzi could have learned through the exercise of ordinary prudence."). But the Court here is mindful to separate reliance from materiality. Plaintiff argues that "it is hard to imagine a fact that would be more important to a U.S. purchaser located in the U.S. than the Absolute Restriction, even where the U.S. purchaser located in the U.S. was acting as a riskless principal." Pl.'s Opp. at 22. Plaintiff alleges that the absolute restriction makes the Notes less valuable and more difficult to sell, both because it limits the universe of potential purchasers and because fewer of the remaining available purchasers (i.e., non-U.S. persons) will want to purchase them, knowing that they, too, will be constrained by the absolute restriction. The Court agrees with Plaintiff that this information alters the total mix of information and that a reasonable investor would consider it important in determining whether to buy the Notes. Therefore, the Court finds that Plaintiff has adequately alleged that this omission was material.

### 3. Justifiable Reliance

As discussed above, Defendants argue that Plaintiff did not justifiably rely on the alleged omission of the absolute restriction, because ABN did not rely on any of the documentation provided to it by Defendants – ABN only agreed to act as a principal in the transaction at the request of "parties other than Eirles and Deutsche Bank" (Capital and Hopewell) who represented that ABN's involvement in the transaction would be "riskless." Eirles Mem. at

23–24.  Defendants argue that, based on ABN's belief that its role would be limited  (because of

Hopewell's commitment to purchase the Notes immediately from ABN), ABN failed to engage

in reasonable due diligence.  Defendants essentially contend that because ABN never expected to

end up holding the Notes, it did not worry about having to market them to another purchaser.

Defendants further argue that reliance in this case is unreasonable because the Programme

Memorandum specifically states that it and the Supplemental Programme Memorandum will

govern the sales of the Notes and that prospective purchasers should not rely on inconsistent

representations.

In response, Plaintiff argues that it did rely on the documents it received, that Defendants

had a duty to disclose the restriction in those documents, and that ABN never would have

entered the deal if those documents had revealed the absolute restriction.  Moreover, Plaintiff

argues that the principal letter agreement between ABN AMRO and Capital specifically

contemplated transactions in securities that did not need to be registered.  For these reasons,

ABN argues it had no reason to believe the Series 42 Notes were absolutely restricted from being

sold in the United States or to U.S. persons.

As with the element of materiality, the Court finds that whether Plaintiff's reliance was

justifiable is a question of fact not properly determined on a motion to dismiss.  See *Marks v.

CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) ("[W]hen we are faced with a

motion for dismissal of the Amended Complaint, in which Marks maintains that the alleged

misrepresentations and omissions were, in fact, material, we cannot say at this point that they

were not material as a matter of law.  The same is true of CDW's reliance argument."); accord

*Basic*, 485 U.S. at 243; *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 (7th Cir. 1988)

("Reliance, like materiality, also depends on each case's facts.  A plaintiff's failure to insist that

a defendant put his representations in writing may indicate that the plaintiff did not consider the

representation important. Other facts, however, may explain that failure. As with materiality, the trier-of-fact is best able to sort out the conflicting evidence and inferences to determine if a plaintiff did, in fact, rely on the defendant's misstatements."); *Sundstrand*, 553 F.2d at 1048 ("With materiality established, reliance in an omissions case is presumed.") (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1072)). As discussed above, Plaintiff has adequately alleged materiality. Plaintiff has also pleaded that Defendants had a duty to disclose the omission, and that the absolute restriction did not appear in any of the documents it had in its possession. Whether those documents put Plaintiff on notice of other documents that did contain the absolute restriction is not a question the Court can answer at this stage of the litigation. Therefore, Defendants' motion to dismiss Count II is respectfully denied on this basis.

### 4.    Scienter

As stated above, the PSLRA requires that Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter, the required state of mind for 10b-5 claims, is defined as "the intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976), or the "reckless disregard of the truth" of the matter asserted, *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998).

The Supreme Court has prescribed a "workable construction of the 'strong inference' standard, [one] * * * geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs*, 127 S. Ct. at 2509. The *Tellabs* "strong inference" standard includes three prescriptions. "*First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509 (citing *Leatherman v. Tarrant County*

*Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). "*Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citation omitted). This second prescription arises from the fact that the proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (citations omitted). "*Third*, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* On this third point, the Supreme Court reversed the Seventh Circuit, which had "expressly declined to engage in such a comparative inquiry." *Id.* Justice Ginsburg reasoned that, in enacting § 21D(b)(2) of the PSLRA, "Congress did not merely require plaintiffs to provide a factual basis for [their] scienter allegations, * * * *i.e.*, to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a 'strong' – *i.e.*, a powerful or cogent – inference." *Tellabs*, 127 S. Ct. at 2510 (citations and internal quotation marks omitted).

Further, the Court explained that "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* Therefore, the Court held,

> To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences * * * Yet the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* (citations and some internal quotation marks omitted). Following *Tellabs*, courts must make a comparative inquiry, weighing inferences drawn in the plaintiff's favor against "plausible opposing inferences." *Id* at 2502; accord *Higginbotham v. Baxter Int'l*, 495 F.3d 753, 756 (7th Cir. 2007). And again, a complaint survives this comparative process only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 127 S. Ct. at 2510.

Although Defendants do not specifically put forth opposing inferences that could be drawn from the facts alleged in order to challenge Plaintiff's scienter allegations, a competing story does appear throughout Defendants' briefs: Confident that its customer Hopewell was going to purchase the Notes from it, Plaintiff simply failed to do its due diligence in deciding whether to purchase the Notes itself. If Plaintiff had read the documentation that it received regarding the Notes, Defendants argue, Plaintiff would have discovered that that documentation was incomplete and that Plaintiff needed to request additional materials – in particular, the Programme Memorandum, which then would have alerted Plaintiff to the importance of the Supplemental Programme Memorandum containing the absolute restriction. These documents "were available to ABN for the asking." Eirles Mem. at 13. This is essentially Defendants' argument against a finding of justifiable reliance, but it also is the only "opposing inference" consistently suggested by Defendants' briefs.

The Court finds, however, that this opposing inference, though plausible, is no more plausible than inferences that can be drawn in Plaintiff's favor. It is perhaps even a bit less plausible. In particular, the Court finds it almost passing strange that (1) none of the documents provided to Plaintiff included the absolute restriction and (2) the only document that *did* include

44

the absolute restriction – the all-important Supplemental Programme Memorandum, which "a prospective purchaser *had* to consult * * * to determine whether a given series of notes could be sold in the United States" (Eirles Mem. at 12 (emphasis added)) – was not even issued until the day of closing. Defendants argue that Plaintiff could have requested a copy of the Supplemental Programme Memorandum prior to closing. That does not address why such an important document – the only document containing a significant restriction on alienation of the Notes – was not prepared, as a matter of course, in advance.

As stated above, recklessness can satisfy the scienter requirement in 10b-5 cases. Recklessness in this context is "the kind of recklessness that is equivalent to wilful fraud." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977). In omission cases, "reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quoting *Franke v. Midwestern Oklahoma Development Authority*, 428 F. Supp. 719 (W.D. Okl. 1976)). Under this definition, the danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even "white heart/empty head" good faith. *Sundstrand*, 553 F.2d at 1045. Without deciding whether Defendants actually *were* reckless in omitting the absolute restriction from the documents provided to Plaintiff, the Court finds that it cannot decide, as a matter of law, that Defendants were *not* reckless. Furthermore, even in light of opposing inferences that may be drawn, Plaintiff's first amended complaint contains enough factual specificity to give rise to a strong inference of scienter, based either on recklessness or specific intent to deceive. Without rehashing every factual allegation regarding Defendants' intent in the

151-page first amended complaint (not including exhibits), the Court notes the following specifically pleaded facts.

ABN alleges that Deutsche Bank knew (and that as Eirles' agent, Deutsche Bank's knowledge is imputed to Eirles) of the absolute restriction; that they knew (both directly and through their agents Capital and Sarco) long before the Notes transaction closed on July 15, 2003, that the Series 42 Notes were in fact being offered and sold to U.S. persons; that they knew ABN was in the Notes distribution chain; and that they nevertheless failed to disclose the absolute restriction to ABN. See Pl.'s Mem. at 25. The first amended complaint alleges that Eirles and Deutsche Bank engaged in this "sham" transaction to maximize their profit and minimize their regulatory and tax burden. FAC ¶ 9. It describes in detail the various agreements Eirles and Deutsche Bank entered to set up an agency arrangement whereby Deutsche Bank would procure purchasers for the Notes on Eirles' behalf. *Id.* ¶¶ 42-77. It explains that Deutsche Bank hired Sarco to help procure purchasers (*id.* ¶¶ 78-88), and it cites numerous phone calls between Sarco's Dan Hajela and Capital's Anthony Long or Deutsche Bank's Paul Levy, illustrating Sarco and Mr. Hajela's role in the transaction. One such conversation discusses the work Mr. Hajela's "sales guys" are doing to find buyers; others illustrate how Mr. Hajela instructed Capital in fulfilling Deutsche Bank's requirements for the deal, and how Deutsche Bank exercised overarching control over Sarco and Capital. *Id.* ¶¶ 87-88, 90-99. Another conversation, between Levy and Long, refers to how "heavily incentivized" Mr. Hajela is to close the deal. *Id.* ¶ 81.

The first amended complaint also explains how Deutsche Bank and Sarco kept the absolute restriction a secret from Capital (*id.* ¶ 111), and how "layering" the transactions maintained the outward appearance that Eirles and Deutsche Bank did not know the Notes were being sold to U.S. persons (*id.* ¶ 112). It cites phone calls wherein Capital's Mr. Long expresses

his concerns about "money laundering" (*id.* ¶ 108), calls where Mr. Hajela explains to Mr. Long that ABN's identity needs to be kept secret from Deutsche Bank's "legal or compliance personnel" (*id.* ¶ 113), and other calls where Mr. Hajela tells Mr. Long and Capital's Mr. Floate not to tell Deutsche Bank about ABN's participation in the deal (*id.* ¶ 114). The first amended complaint also explains that, despite these efforts, or perhaps as part of the overall scheme, Deutsche Bank knew about ABN and its role in the transaction. Mr. Long testified about repeatedly telling Deutsche Bank about ABN. *Id.* ¶¶ 116-17. In an email sent on May 13, 2003, Mr. Levy commented to Mr. Hajela about a "recent development with ABN," whom Levy acknowledged was acting as a "broker" in the Series 42 Notes transaction. *Id.* ¶ 118. Another conversation has Mr. Long telling Mr. Levy he still needs signatures "from the States" to go forward with the deal. *Id.* ¶ 119. Another has Mr. Levy asking Mr. Floate, "Do you have what you need from Dan's U.S. guy?" *Id.* ¶ 120.

The complaint continues, explaining how Sarco directed Capital in putting the deal together, and illustrating with more conversation excerpts and emails. *Id.* ¶¶ 132-42. Sarco/Hajela argue that Plaintiff has not shown that Sarco was a "primary actor" in the Series 42 Notes transactions, because Plaintiff cites no conversations between Mr. Hajela and anyone at ABN, and cites no agreements to which Sarco is a signatory. Sarco/Hajela further argue that they had no fiduciary relationship to ABN and therefore no duty to disclose the absolute restriction. Sarco/Hajela contend that Plaintiff's allegations amount to no more than a claim that Sarco/Hajela aided and abetted the other Defendants' alleged securities fraud, which is not actionable under § 10(b) or Rule 10b-5. Plaintiff counters that it is not necessary for a defendant to be a signatory to an agreement or to have direct contact with Plaintiff in order to be liable as a primary actor. Plaintiff further argues that Sarco/Hajela's duty to disclose arose from knowledge of the absolute restriction, as opposed to a fiduciary relationship.

The Court agrees with Plaintiff. "'[A]ctual or first-hand contact with offerees or buyers [is not] a condition precedent to primary liability for antifraud violations,' so long as the requisite intent [is] established." *McConville v. SEC*, 465 F.3d 780, 787 (7th Cir. 2006) (quoting *SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982)). Plaintiff is not alleging that Sarco/Hajela merely aided and abetted the other Defendants' fraud. (Nor could it. The Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) holds that there is no aiding and abetting liability in private actions under § 10(b) and Rule 10b-5.) Plaintiff alleges facts to demonstrate that Sarco was substantially involved in drafting and disseminating the Series 42 Notes transaction documentation and relaying it to ABN. FAC ¶ 87 (describing the range of duties held by Sarco/Hajela in drafting and transmitting documents, instructing Capital and Hopewell as to Deutsche Bank's requirements, and acting as the primary conduit of information between Deutsche Bank, Capital, ABN, Hopewell, and the purported end purchasers). The first amended complaint also alleges that Sarco participated in scores of phone calls and emails with Deutsche Bank, approximately 175 phone calls and 100 emails with Capital, and "numerous" phone calls with ABN between mid-April 2003 and July 15, 2003, to set up the deal.[11] *Id.* ¶ 88.

---

[11] As discussed above with respect to the Rule 12(b)(2) motions, there is a factual dispute regarding whether Mr. Hajela ever actually spoke to anyone at ABN. ABN cites to numerous phone calls and emails between Mr. Hajela and Mr. Long, among others, wherein Mr. Hajela states that he has or will be speaking to someone at ABN. In response, Sarco/Hajela assert that this was just a shorthand method of communicating that Mr. Hajela was going to speak to Mr. Recile, who would speak to someone at Hopewell, who would speak to someone at ABN. This dispute was also the subject of a surreply by ABN (see DE 207-2) and a memorandum in further support by Sarco/Hajela (see DE 219). On a Rule 12(b)(6) motion, the Court must disregard Sarco/Hajela's factual challenges to Plaintiff's allegations and construe those allegations in Plaintiff's favor. Moreover, and as noted above, Sarco/Hajela never denies that the conversations cited in ABN's response took place. Even setting aside the factual dispute about whether Mr. Hajela ever spoke directly to anyone at ABN, those conversations support the inference that Sarco was directing Capital in soliciting ABN to enter the deal. Most of the conversations involve Mr. Hajela giving updates on his progress getting the needed documentation and signatures from ABN. In one, Mr. Hajela states, "The main thing always is—is just getting the AMRO letter * * * * So now the AMRO letter process I manage at this end." FAC ¶ 89.

These allegations go beyond mere aiding and abetting. Plaintiff alleges that Sarco was actively involved in the fraud and also controlled Capital in implementing the fraud, which distinguishes this case from those cited by Sarco/Hajela. In *Foss v. Bear Stearns & Co., Inc.*, 394 F.3d 540, 541-43 (7th Cir. 2005), for example, the Seventh Circuit dismissed a claim against a Bear Stearns account executive who allegedly had assisted his father-in-law in stealing securities from an estate the father-in-law administered, because the complaint alleged that the son-in-law had defrauded the estate. Because the son-in-law had not defrauded his father-in-law, he had not defrauded the estate (which "knew" whatever the father-in-law knew) and therefore there was no fraud. Likewise, *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997) is distinguishable. That case involved Section 10(b) claims against an accounting firm for failing to disclose various material facts to limited partners who had invested $13 million in a partnership audited by the defendant accounting firm. *Id.* at 718–19. In affirming dismissal of the claims, the Second Circuit noted that the complaint had been filed before the Supreme Court's decision in *Central Bank of Denver*, and was more or less explicitly predicated on aiding and abetting liability. *Id.* at 719. "We construe plaintiffs' complaint against Touche Ross as primarily alleging aiding and abetting the principal defendants. Allegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms used throughout the complaint all fall within the prohibitive bar of *Central Bank*. A claim under § 10(b) must allege a defendant has made a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of a security." *Id.* at 720-21 (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 581 (2d Cir. 1990)). Plaintiff here has not fallen into the same trap. Instead, as discussed above, Plaintiff carefully alleges that Sarco was primarily involved with the alleged fraud against ABN.

The first amended complaint culminates in a lengthy discussion of ABN's involvement in the deal, beginning with the initial contact with ABN, which was made by Franklin Ogele, president of Hopewell Capital Group, at Sarco's instruction. FAC ¶¶ 137, 146. On May 2, 2003, Mr. Ogele sent ABN a Deutsche Bank-drafted document purporting to include the material terms of the Notes. From then on, Mr. Ogele and Mr. Long contacted ABN repeatedly (allegedly on Mr. Hajela's instructions) to line up the required documentation and signatures for completing the transaction according to Deutsche Bank's mandated procedures and substantive requirements. This is just a sampling of the detailed descriptions of the events, exchanges, and interactions included in the first amended complaint. Its allegations include far more specificity than this brief summary.

The Court finds that these allegations satisfy the PSLRA's heightened pleading requirements because they are specific enough to create a strong inference of scienter. In particular, the phone calls and emails among the various Defendants cited in the Complaint collectively give rise to an inference that Deutsche Bank's Mr. Levy was instructing Capital's Mr. Long and Sarco's Mr. Hajela in putting the deal together according to Deutsche Bank's imposed specifications; that Mr. Hajela and Mr. Long were supposed to keep ABN's identity a secret from Deutsche Bank's compliance personnel; but that Mr. Levy was well aware of ABN's role in the transaction and was intent on closing the deal with ABN as a part of it.

Again, Justice Ginsburg's opinion in *Tellabs* emphasizes that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." 127 S. Ct. at 2510. Instead, the inference "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id.* Justice Scalia's *Tellabs* dissent demonstrates that the majority's standard is not as strict as it might have been. He states at the outset:

> I fail to see how an inference that is merely "at least as compelling as any
> opposing inference," ante, at 2505, can conceivably be called what the statute
> here at issue requires: a "strong inference," 15 U.S.C. § 78u-4(b)(2). If a jade
> falcon were stolen from a room to which only A and B had access, could it
> *possibly* be said there was a "strong inference" that B was the thief? I think not,
> and I therefore think that the Court's test must fail. In my view, the test should be
> whether the inference of scienter (if any) is more plausible than the inference of
> innocence.

127 S. Ct. at 2513 (Scalia, J. dissenting). The Court finds Plaintiff's version at least as

compelling as other opposing inferences, and potentially even more compelling. Under the

*Tellabs* majority's "at least as compelling" comparative standard, the Court finds that Plaintiff

has satisfied the PSLRA's heightened pleading requirement and shown a "strong inference" of

scienter.

### 5. *Transaction and Loss Causation*

The final element of Plaintiff's federal securities fraud claim is causation. In Rule 10b-5

cases, causation has two necessary components: "transaction causation" and "loss causation."

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997); accord *Dura

Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). "To plead transaction causation, the

plaintiff must allege that it would not have invested in the instrument if the defendant had stated

truthfully the material facts at the time of the sale." *Caremark*, 113 F.3d at 648. "To plead loss

causation, the plaintiff must allege that it was the very facts about which the defendant lied

which caused its injuries." *Id.* Here, Plaintiff has adequately alleged both transaction causation

and loss causation.

As discussed above, Plaintiff alleges that the omission of the absolute restriction from the

documents provided to Plaintiff was material and that Defendants had a duty to disclose the

absolute restriction. Plaintiff alleges that it would not have purchased the Series 42 Notes if

Eirles, Deutsche Bank, and their agents had disclosed the absolute restriction. Plaintiff also

alleges that this allegedly material omission caused Plaintiff's injuries, in that it put a "potential cloud" on ABN's title to the Notes, limited ABN's ability to find subsequent purchasers of the Notes, and devalued the Notes from the price listed in the Bloomberg Notice and the term sheets.

In response, Defendants argue that the restriction on resale was not the cause of ABN's economic loss and that it purchased the Notes at Capital and Hopewell's request, and for Hopewell's benefit, with the expectation that Hopewell would then purchase the Notes from ABN. In other words, Defendants argue that Hopewell caused Plaintiff's injuries and also induced Plaintiff to enter the transaction. But, again, these are questions of fact. Plaintiff need not plead causation with specificity. See *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 742-43 (N.D. Ill. 2006) (collecting cases finding that *Dura* does not impose heightened pleading standards for the causation elements of a securities fraud claim). All that is required at this stage is that the Complaint allege more than an inflated purchase price. See *id.* "[S]pecifically, a securities fraud plaintiff must 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.' The [*Dura*] Court observed, however, that this was 'not meant to impose a great burden upon a plaintiff.'" *Id.* at 742 (quoting *Dura* 544 U.S. at 347) (internal citations omitted). Plaintiff has satisfied these requirements and therefore the Court finds that Plaintiff has adequately alleged transaction and loss causation.

For the reasons stated above, the Court respectfully denies Defendants' motion to dismiss Count II of the Complaint, the federal securities fraud claim.

### D.   Count III – Control Person Liability

Count III is against Mr. Hajela only. In Count III, Plaintiff claims that Mr. Hajela was a control person under section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). The Exchange Act imposes liability not only on the person who actually commits the securities law violation, but also on the persons who "directly or indirectly" control the violator. 15 U.S.C. § 78t(a). Where

a complaint adequately alleges securities violations against a company, the complaint also adequately alleges controlling person liability against the individuals who allegedly controlled the company. *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 983 (N.D. Ill. 2006) (citing *Makor*, 437 F.3d at 605). As explained above, Plaintiff has adequately pleaded an underlying securities violation against Sarco. In addition, Plaintiff properly alleges that Mr. Hajela was a high-level officer who controlled Sarco, as he was the sole shareholder, director, and officer of the company, and he alone was responsible for making all decisions relating to the business of Sarco. Therefore, Plaintiff's control person allegation stands.

### E.     Count IV – Violations of the Illinois Securities Law

Count IV alleges violations of Sections 12(F), (G), and (I) of the Illinois Securities Law against all Defendants. See 815 ILCS 5/12(F), (G), and (I). Section 12 of the Illinois Securities Law provides:

> It shall be a violation of the provisions of this Act for any person:
>
> * * *
>
> F.     To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.
>
> G.     To obtain money or property through the sale of securities by means of any untrue statement of a material fact * * * *
>
> I.     To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

815 ILCS 5/12 (West 1998). See also *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 455 (1st Dist. 2004). Sections 12(F), 12(G), and 12(I) of the Illinois Securities Law are modeled after sections 17(a)(1) through (a)(3) of the federal Securities Act, 15 U.S.C. § 77q(a)(1) through (a)(3) (2000). See *Tirapelli*, 351 Ill. App. 3d at 455. Sections 17(a)(1) through (a)(3) of the Securities Act require nearly the same elements as section 10(b) of the Securities Exchange Act

and Rule 10b-5, *id.* (citing *Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1536 (S.D.N.Y. 1983)), although scienter is not a required element under section 17(a)(3) of the Securities Act. *Id.* Therefore, Illinois courts look to federal securities fraud case law in interpreting those sections of the Illinois Securities Law. See *id.*

Defendants do not argue otherwise, and in fact, Eirles/Hajela simply reference their federal securities fraud arguments in the Illinois securities fraud section of their brief. (Sarco/Hajela do not address the elements of the Illinois securities fraud claim or whether Plaintiff has sufficiently pleaded them.) Defendants also argue that Plaintiff's Illinois securities fraud claim is untimely, because Plaintiff allegedly did not file its claim within six months of discovering the fraud, as required by the Illinois law.

The Court respectfully denies Defendants' motion to dismiss the Illinois securities fraud claim. For the reasons discussed above with respect to the federal securities fraud claim, the Court finds that Plaintiff has adequately stated a claim under the Illinois law as well. Moreover, Defendants' untimeliness argument is not properly addressed on a motion to dismiss. See, *e.g.*, *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court – that is, admits all the ingredients of an impenetrable defense – may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).") (collecting cases); accord, *e.g.*, *Walker v. Thompson*, 288 F.3d 1005, 1010 (7th Cir. 2002) (discussing statute of limitations issues). The statute of limitations is an affirmative defense that Plaintiff was not required to anticipate in its Complaint. Additionally, Plaintiff argues in its responses to Defendants' briefs that it *did* timely file. For these reasons, the Court respectfully denies Defendants' motions to dismiss the Illinois securities fraud claims.

### F.        Count V – Common Law Fraud

Count V alleges a common law fraud claim against all Defendants. Under Rule 9(b), a

plaintiff must plead "the circumstances constituting fraud * * * with particularity." *In re HealthCare Compare Corp. Secs. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). In other words, Rule 9(b) requires the complaint to include "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). As this Court has found that Plaintiffs adequately alleged fraud under the much more rigorous PSLRA, it also finds that Plaintiff has adequately alleged its fraud claims with particularity as mandated by Rule 9(b). See *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 983 (N.D. Ill. 2006). Therefore, Defendants' motions to dismiss the common law fraud claim are respectfully denied.

### G. Count VI – Violation of the Illinois Consumer Fraud Act

Count VI alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2 ("Illinois Consumer Fraud Act"), against all Defendants. Defendants argue that this claim must fail because Plaintiff has not alleged either that it is a "consumer" within the meaning of the Act or that the sale of "a single Note" constitutes a sufficient consumer nexus to implicate consumer protection concerns. Defendants further argue that Plaintiff does not have standing to sue under the Act as a "person" authorized to maintain an action pursuant to 815 ILCS 505/10a.

> The Consumer Fraud Act prohibits the
>
> employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" * * * in the conduct of any trade or commerce.

815 ILCS 505/2. It is "'primarily concerned with protecting consumers,'" *Nakajima All Co. Ltd. v. SL Ventures, Corp.*, 2001 WL 641415, at *2 (N.D. Ill. June 4, 2001) (quoting *Indus. Specialty Chems. v. Cummins Engine Co.*, 902 F. Supp. 805, 811 (N.D. Ill. 1995)), which it defines as

"any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household," 815 ILCS 505/1(e). The Act, however, also seeks to protect businesses from "fraud and unfair competition," *Mitsubishi Elec. Corp. v. IMS Tech., Inc.*, 1997 WL 630187, at *10 (N.D. Ill. Sept. 30, 1997) (Williams, J.), thus allowing business entities to be considered "persons" under the Act, 815 ILCS 505/1(c); accord *Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc.*, 214 Ill. App. 3d 1073, 1082 (5th Dist. 1991), and to bring suit as "representative[s] of the consumer interest." *Speakers of Sport, Inc. v. ProServ*, Inc., 178 F.3d 862, 868 (7th Cir. 1999).

To state a claim under the Illinois Consumer Fraud Act, a plaintiff must allege that (1) the defendant engaged in a deceptive act or practice, (2) with the intent that the plaintiff rely on the deception, (3) in the course of trade or commerce, and that (4) the deception was the proximate cause of the claimant's alleged injury. See, *e.g.*, *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 731 (N.D. Ill. 2005) (citing *Neff v. Capital Acquisitions & Mgmt. Co.*, 238 F. Supp. 2d 986, 994 (N.D. Ill. 2002)). A complaint alleging a violation of the Illinois Consumer Fraud Act must be pleaded with the same particularity and specificity under Rule 9(b) as that required for common law fraud. See, *e.g.*, *Costa*, 390 F. Supp. 2d at 731 (collecting cases). Specifically, a plaintiff must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated. See, *e.g.*, *Sears*, 912 F.2d at 893; *DiLeo*, 901 F.3d at 627.

The Court respectfully rejects Defendants' argument that Plaintiff has failed to meet the threshold pleading requirement. First of all, a plaintiff suing under the Act may state a claim based upon a single, isolated injury, and based solely upon the plaintiff's own injury. See *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436 (7th Cir. 1996) (citing *Rubin v. Marshall Field & Co.*, 232 Ill. App. 3d 522, 531-32 (1st Dist. 1992)). Second, to successfully plead a

consumer nexus, a plaintiff need only allege that the conduct complained of "involves trade practices directed to the market generally or otherwise implicates consumer protection concerns." *Athey*, 89 F.3d at 437 (collecting cases). Illinois courts have held that a complaint implicates consumer protection concerns when a business sues another business as the consumer of that business's goods or services. See *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 532-33 (2nd Dist. 1989) (citations omitted); see also *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical*, 275 Ill. App. 3d 452, 458 (2nd Dist. 1995) (noting that "the *Downers Grove* court had little difficulty determining that consumer protection concerns were implicated because the plaintiff's complaint alleged that the defendant had distributed to consumers approximately 15,000 brochures containing allegedly false statements regarding the plaintiff's business practices"). Courts in this district have allowed similar claims to go forward, finding that the conduct complained of targets the market generally. See *StunFence, Inc. v. Gallagher Security (USA), Inc.*, 2002 WL 1838128, at *6 (N.D. Ill. Aug. 12, 2002) ("The allegations in Count XI primarily focus on the effect of Gallagher's actions on StunFence's business, but they also allege that those actions will confuse and deceive the ultimate consumer of the electrified fence systems about the true source and quality of the components used within the Gallagher fences. These are issues that implicate concerns of the ultimate consumer."); *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.*, 657 F. Supp. 1486, 1493 (N.D. Ill. 1987) (allegations that defendant made alleged misrepresentations "in the marketplace and to actual and/or prospective customers" sufficient to state a claim); see also *Gold v. Golden G.T., LLC*, 2005 WL 2465815, at *4 n.4 (N.D. Ill. Oct. 4, 2005) (collecting Northern District and Illinois cases discussing pleading requirements for alleging a "consumer nexus").

Assuming all alleged facts to be true and drawing all reasonable inferences for Plaintiff,

the Court finds that ABN has sufficiently alleged that Defendants' misrepresentations were directed at the market generally and that they implicate consumer protection concerns. Plaintiff therefore has satisfied the requisite consumer nexus pleading requirement. In particular, Plaintiff alleges that Deutsche Bank hired Sarco, who then marketed the Notes to various buyers – including but not limited to ABN and Hopewell – within the United States in an effort "to set up a sham distribution chain that ran right through Illinois." FAC ¶¶ 83, 86-87 (discussing Mr. Hajela's communications with Deutsche Bank's Mr. Levy regarding Mr. Hajela's efforts to "procure[ ] firm commitments from additional purchasers" and to market and communicate the terms of the Notes to other potential purchasers); FAC ¶ 295 ("[T]o the extent this fraud was perpetrated with respect to other Eirles Notes, the misconduct was directed to and affected the market generally."). Thus, Plaintiff has appropriately pleaded a consumer nexus by alleging that Defendants' trade practices were directed at the market generally and further alleging financial harm. See *Pain Prevention Lab*, 657 F. Supp. at 1493 (allegations of misrepresentations concerning approval of a device by the FDA and the existence of a patent which were made "in the marketplace and to actual and/or prospective customers" were sufficient to state a claim under the Consumer Fraud Act). Although Defendants are free to raise their arguments upon development of a full factual record, the Court concludes that Plaintiff has sufficiently stated a claim at this stage of the proceedings. The Court respectfully denies Defendants' motion to dismiss the Consumer Fraud Act claim.

### H.     Count VII – Unjust Enrichment

In Count VII, Plaintiff alleges a claim of unjust enrichment against Deutsche Bank, Sarco, and Mr. Hajela. Under Illinois law, a plaintiff states a cause of action for unjust enrichment by demonstrating that the defendant "unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of that benefit violates fundamental principles of

justice, equity and good conscience." *Anecca, Inc. v. Lexent, Inc.*, 345 F. Supp. 2d 897, 908 (N.D. Ill. 2004) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 131 Ill. 2d 145, 159 (1989)).

Plaintiff alleges that Defendants unjustly demanded and received an inflated price for the Series 42 Notes as a result of fraud. Defendants argue that ABN AMRO's unjust enrichment claim is identical to its claims for federal and state securities fraud and common law fraud and that, therefore, as a matter of law, it is subsumed in those claims. Defendants further argue that ABN AMRO is barred by the doctrine of unclean hands from raising this claim because ABN was reckless in failing to conduct due diligence with respect to the terms of the Notes.

Defendants cite *Charles Hester Enter. Inc. v. Ill. Founders Ins. Co*, 137 Ill. App. 3d 84, 89-90 (5th Dist. 1985), in support of the proposition that unjust enrichment is not a separate claim.. But *Hester* merely held that unjust enrichment could not be the basis of a claim to impose a constructive trust. Rather, actual fraud or abuse of a fiduciary relationship is what is required to give rise to a constructive trust, neither of which had been alleged in that case. *Id.* at 90-91. *Hester* stated that "the term unjust enrichment is not descriptive of a conduct that, standing alone, will justify an action for recovery [seeking to raise a constructive trust]. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, and may be redressed by a cause of action based upon that improper conduct." *Id.*; see also *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 328 (1977) (holding that a constructive trust claim based on unjust enrichment should be dismissed if there is a lack of fiduciary relationship). Moreover, Plaintiff cites several Illinois and Northern District cases allowing claims for both fraud and unjust enrichment to go forward. *E.g.*, *Peddinghaus v. Peddinghaus*, 314 Ill. App. 3d 900, 905-09 (1st Dist. 2000) (reversing dismissal of fraud count and unjust enrichment count and stating, "Defendants' fraud, if proved, also

constitutes unjust enrichment"); accord, *e.g.*, *Coglianese*, 332 F. Supp. 2d at 1119–20 (denying motion to dismiss unjust enrichment claim in cause that also sufficiently alleged fraud). It follows that Defendants' motion to dismiss the unjust enrichment claim may not be granted on this basis.

Nor may it be granted on the basis of Defendants' argument that Plaintiff is estopped from raising such a claim by the doctrine of "unclean hands." A claim for unjust enrichment may be denied under the doctrine of "unclean hands" if a plaintiff's recklessness caused his injury. *TRW Title Ins. Co. v. Security Union Title Ins. Co*., 153 F. Supp. 2d 822, 829 (7th Cir. 1998) (citing *United States v. Burcyzk*, 556 F.2d 394, 397 (7th Cir. 1997)). However, this is an affirmative defense and thus is not a proper basis to dismiss a claim by a motion to dismiss unless the face of the complaint shows beyond doubt that an affirmative defense is dispositive. See *Circle Group Holdings, Inc. v. Akhamzadeh*, 2006 WL 2548164, at *8 (N.D. Ill. Sept. 1, 2006) (citing *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003); *Deckard v. General Motors Corp.*, 307 F.3d 556, 560 (7th Cir. 2002)); accord *Xechem, Inc.*, 372 F.3d at 901; *Walker*, 288 F.3d at 1010. Plaintiff's first amended complaint does not plead all the elements of an unclean hands defense, and therefore the unjust enrichment claim may not be dismissed on this basis either.

Finally, Sarco's argument that this claim must fail as to it and Mr. Hajela because Plaintiff has not alleged that they retained a benefit also must fail. Plaintiff alleges that Sarco retained a portion of the inflated price charged for the Notes by Deutsche Bank, specifically Sarco's $4.6 million fee. See FAC ¶¶ 189–93, 252. That is sufficient to survive a motion to dismiss.

I.      **Counts VIII and IX – Negligent Misrepresentation**

In Count VIII, Plaintiff brings a claim for negligent representation against Deutsche Bank

and Eirles for failure to disclose material facts relating to (i) the alleged overpricing of the Series 42 Notes and (ii) the fact that the Series 42 Notes transaction was not a legitimate arm's-length transaction between a willing and independent buyer and seller that reflected the fair market value of the Series 42 notes. In Count IX, Plaintiff brings, in the alternative, a negligent misrepresentation claim against Deutsche Bank and Eirles for failing to disclose the absolute restriction.

In order to state a claim for negligent misrepresentation under Illinois law, a party must allege (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information. See *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833–34 (7th Cir. 2007). Suits for purely economic damages based on negligent misrepresentations generally are barred in Illinois under the so-called *Moorman* doctrine. See *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 89 (1982). However, the Illinois Supreme Court has imposed a duty on a party to avoid negligently conveying false information if the party is in the business of supplying information for the guidance of others in their business transactions. See *First Midwest Bank, N.A.*, 218 Ill. 2d 326, 335 (citing *Brogan v. Mitchell International, Inc.*, 181 Ill.2d 178, 183–84 (1998); *Moorman*, 91 Ill. 2d at 89).

Defendants argue that Plaintiff has not demonstrated (i) that Defendants are in the business of supplying information, or (ii) that the information supplied was provided for Plaintiff's use in its transactions with third parties, as opposed to its use for transactions with

Defendants.[12]  With respect to the latter argument, although a third-party requirement does appear in some of the cases cited by the parties, *e.g.*, *Rankow v. First Chicago Corp.*, 870 F.2d 356, 362 (7th Cir. 1989), the Illinois Supreme Court has more recently and emphatically held that there is no "third-party requirement" in negligent misrepresentation claims.  See *Fireman's Fund Ins. Co. v. S.E.C. Donahue, Inc.*, 176 Ill. 2d 160, 166 (1997) ("Appellate court decisions that refer to an additional third-party requirement * * * are overruled on this point.") (internal citations omitted).  With respect to the former argument – that Plaintiff has not demonstrated Defendants are in the business of supplying information – as discussed below, the Court finds that Plaintiff has adequately pleaded as much, which is enough to survive a motion to dismiss.

Case law instructs that the Court must make a precise, case-specific analysis to determine whether a defendant was in the business of supplying information.  See *Hotel Employees and Restaurant Employees Intern. Union Welfare Fund v. Sav-Rx*, 2007 WL 1423863, at *2 (N.D. Ill. May 10, 2007) (citing *Rankow*, 870 F.2d at 361).  In this regard, courts have identified three categories of businesses:  (1) businesses that supply only non-informational goods or services, where any information supplied is incidental to the sale of the product; (2) businesses that supply information as well as non-informational goods or services; and (3) businesses that provide a product consisting solely of information.  See *Hotel Employees*, 2007 WL 1423863, at *2 (citing *General Elec. Capital Corp. v. Equifax Svcs., Inc.*, 797 F. Supp. 1432, 1442–43 (N.D. Ill. 1992)).  As stated, Illinois case law under the *Moorman* doctrine bars negligent misrepresentation claims against the first category of businesses.  But it allows such claims against the third category of businesses.  And "[b]etween these two extremes lie the more difficult cases, involving

---

[12]  Defendants also argue that the negligent misrepresentation claims should fail for the same reasons that they argued the fraud claims should fail:  there was no false statement; no intent that ABN rely on Defendants statements; no reliance by ABN; and no causation, inasmuch as any damages were caused by Hopewell, not Defendants.  The Court rejects these arguments here for the same reasons that it rejected them with respect to the fraud claims.

defendants whose business it is to provide both tangible goods (or other non-informational goods or services) *and* information." *Rankow*, 870 F.2d at 364; see also *Hotel Employees*, 2007 WL 1423863, at *2 (quoting same).

The negligent misrepresentation exception to the *Moorman* doctrine for pure information providers has been applied to accountants; a bank providing credit information to a potential lender; aircraft, inventory, and termite inspectors; a title insurer; real estate brokers; and stockbrokers. *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 355 Ill. App. 3d 546, 557-58 (1st Dist. 2005) (collecting cases). "In these cases, the product was purely information – the consumer received analytical work rather than a tangible product. 'In other words, the end product [was] the ideas, not the documents or other objects into which the ideas [were] incorporated.'" *Id.* at 169 (quoting *Tolan & Son*, 308 Ill. App. 3d at 29). "[S]upplying information need not encompass the enterprise's entire undertaking [for the defendant to fall within the information provider exception,] but [information] must be central to the business transaction between the parties." *Tolan & Son*, 308 Ill. App. 3d at 29 (citation omitted).

In contrast, when the information offered by the defendant relates to the defendant's tangible goods and/or noninformational goods or services, the information is considered merely ancillary or incidental, and the defendant is not deemed to be in the business of providing information and is not liable for negligent misrepresentation. See *First Midwest Bank*, 355 Ill. App. 3d at 558 (citing *Tolan & Son*, 308 Ill. App. 3d at 29). Examples of defendants in this category include manufacturers and sellers of tangible goods such as computers and construction materials, architects and engineers retained to design and build buildings, and temporary employment agencies. See *First Midwest Bank*, 355 Ill. App. 3d at 558 (collecting cases); *Tolan & Son*, 308 Ill. App. 3d at 31 (engineers and architects); *Fox Associates, Inc. v. Robert Half International, Inc.*, 334 Ill. App. 3d 90, 93–95 (1st Dist. 2002) (temp agencies).

The Court finds that Plaintiff has sufficiently pleaded that Defendants collectively fall into the middle category of hybrid businesses. With respect to these businesses, case law instructs that a plaintiff's claim for negligent misrepresentation may go forward when the information furnished was "an important part of the product it offered." *Hotel Employees*, 2007 WL 1423863, at *2 (quoting *Rankow*, 870 F.2d at 365) (internal quotation marks omitted). In *Hotel Employees*, the district court found that the plaintiff hotel union welfare fund had sufficiently alleged a negligent misrepresentation claim where the Fund allegedly made overpayments for pharmacy prescriptions that its members received through participating pharmacies in reliance on information provided by defendants, who managed the fund's pharmacy benefits plan. *Hotel Employees*, 2007 WL 1423863, at *3. "[I]t is not beyond doubt that Defendants provided information that was important to their business of managing the Fund's pharmacy benefits and such information guided Plaintiff in its transactions with a third party." *Id.* Likewise, in *Rankow*, the Seventh Circuit found that plaintiffs had stated a claim based on information the defendant bank provided plaintiffs regarding pricing dates for a Dividend Reinvestment and Stock Purchase Plan plaintiffs participated in with the Bank and which plaintiffs relied on in their subsequent short sales in the market. *Rankow*, 870 F.2d at 363. The Seventh Circuit found that this information was an important part of the bank's financial services product, and therefore allowed the negligent misrepresentation claim. *Id.*

Plaintiff alleges that supplying information is an important part of Defendants' business, because prospective buyers rely heavily on the information Defendants provide in deciding whether to purchase the Notes. Defendants argue that the information provided to Plaintiff was incidental to the tangible product – the Notes – and therefore that Defendants are not in the business of providing information for the guidance of others. The Court finds that it cannot determine as a matter of law whether Defendants are in the business of supplying information,

but that Plaintiff has at least sufficiently alleged that Defendants are in the hybrid category of businesses that supply both information and non-informational "products."  See *Tricontinental Industries*, 475 F.3d at 838 (Rule 8's notice-pleading standards govern negligent misrepresentation claims.).  The inquiry is a factual one that "requires a more thorough examination of the facts than can be performed on the pleadings alone."  *Hotel Employees*, 2007 WL 1423863, at *3 (quoting *Rankow*, 870 F.2d at 359 n.3).  At the motion to dismiss stage, a federal court should not further weigh Plaintiff's evidence or evaluate the merits of its claim. Therefore, Defendants' motion to dismiss this claim is respectfully denied.

### J.  Count X – (In the Alternative) Alter Ego Liability

In Count X, Plaintiff alleges, in the alternative to its theory of agency liability with respect to Eirles and Deutsche Bank, that Eirles was Deutsche Bank's alter ego.  Defendants argue that alter ego liability is not a separate cause of action under Illinois law and therefore that this count must be dismissed.  The Court respectfully disagrees.  Plaintiff has adequately stated a claim for alter ego liability under Illinois law.

The alter ego doctrine is an equitable doctrine used to prevent inequitable results.  *LM Ins. Corp. v. Sourceone Group, Inc.*, 2006 WL 2051368, at *17 (N.D. Ill. July 18, 2006) (citation omitted).  Courts in this and other federal districts in Illinois have recognized such claims under Illinois law.  See *id.* at 15; see also *Central Illinois Carpenters Health and Welfare Trust Fund v. Strom*, 2007 WL 2700502, at *1 (C.D. Ill. June 29, 2007) (declining to dismiss a claim for alter ego liability under Illinois corporate veil piercing law because "a litigant need not present evidence or allege factually detailed claims in his complaint").  "A claim for alter ego is one to disregard the separate corporate identities of related corporate entities because one entity 'is so controlled and its affairs so conducted that it is a mere instrumentality of another.'"  *LM Ins. Corp.*, 2006 WL 2051368, at *15 (quoting *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 204-

05 (Ill. 1981)).  In addition, it must be the case that "the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."  *Id.* (citation omitted).

Defendants cite *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 526-27 (2nd Dist. 2002), for the proposition that, in Illinois, alter ego liability is not in itself a cause of action.  Rather, Defendants argue, *Peetoom* holds that to pierce the corporate veil of a corporation by alleging it is the alter ego of another entity, Plaintiff must do so as part of an underlying cause of action. The veil-piercing doctrine "fastens liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business."  334 Ill. App. 3d at 527 (citation omitted).  It is used to impose liability on an underlying cause of action such as a tort or breach of contract.  *Id*.  Yet this appears to be exactly what Plaintiff seeks to do.  Plaintiff has alleged multiple tort counts against Defendants, chiefly based on agency theories, and, in the alternative, Plaintiff seeks to establish liability under an alter ego theory.  FAC ¶ 351.

Moreover, *Peetoom* seemingly goes further than Plaintiff here suggests.  There, the Illinois appellate court allowed the plaintiff's alter ego claim to go forward, because the claim sought to enforce the judgment in an underlying case against the corporate defendants, even though the alter ego claim was the only claim in the complaint.  See 334 Ill. App. 3d at 527.  The court reasoned, in part, that "[a] new proceeding is proper because, where a party obtains a judgment against another party, the underlying claim merges with the judgment and the judgment becomes a new and distinct obligation of the corporation which differs in nature and essence from the original claim."  *Id.* at 528 (quoting *Pyshos v. Heart-Land Development Co.*, 258 Ill. App. 3d 618, 624 (1st Dist. 1994)) (internal quotation marks omitted); see also *id.* at 528-29 (collecting Illinois authorities finding that a judgment creditor may initiate an action to pierce the corporate veil to enforce a judgment against a corporation's shareholders).

66

In this case, Plaintiff argues that, contrary to the appearance that Eirles and Deutsche Bank were acting as separate entities with respect to the issuance and sale of the Notes (which appearance was created by various contracts setting forth an agency relationship between Eirles and Deutsche Bank), in fact the majority of Eirles' board of directors never negotiated any of Eirles' contracts with Deutsche Bank, and Eirles does not act independently of Deutsche Bank. Rather, Plaintiff alleges that Deutsche Bank has dominated and controlled Eirles and has used Eirles to enhance its own profits. That is sufficient to state a claim for alter ego liability. See *LM Ins. Corp.*, 2006 WL 2051368, at *15. Therefore, the Court respectfully denies Defendants' motion to dismiss this separate claim.

## IV.    Conclusion

For the reasons given above, the Court respectfully denies both Defendants' motions to dismiss for lack of personal jurisdiction [127, 166] and their motions to dismiss for failure to state a claim [124, 163].

Dated: September 16, 2008                    _____
                                             Robert M. Dow, Jr.
                                             United States District Judge